UNITED STATES of America,
Appellee,

v.

Abdul J. GBEMISOLA, Appellant.

No. 99–3123.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 20, 2000.

Decided Sept. 12, 2000.

Edward C. Sussman, appointed by the court, argued the cause and filed the brief for appellant.

Elizabeth Carroll, Assistant United States Attorney, argued the cause for appellee. With her on the brief were Wilma A. Lewis, United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., William J. O'Malley, Jr., and Eumi Choi, Assistant United States Attorneys.

Before: SENTELLE, TATEL, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

Abdul J. Gbemisola appeals his conviction for possession with intent to distribute over one kilogram of heroin. He argues that evidence obtained through the use of an electronic tracking device should have been suppressed because the device was installed outside the jurisdiction of the magistrate judge who issued the warrant for its installation. He also argues that the evidence at trial was insufficient to support his conviction and that he was improperly joined for trial with two co-defendants. We find no merit to these arguments and affirm the conviction.

**I**

On March 6, 1998, the U.S. Customs Service at the port of entry in Memphis, Tennessee selected for examination a box being shipped by Federal Express from Cambodia to a "Mail Boxes Etc." location in Washington, D.C.[1] The box aroused Customs' suspicions because it came from a narcotics source country, had atypical merchandise, and had no value listed on the waybill. Upon opening the box, agents found six cooking pots that smelled of fresh paint, were unusually heavy, and had observable "depth discrepancies"—i.e., false bottoms. Inside the false bottom of each pot was a translucent bag of heroin. Customs then checked for other boxes from the same shipper and found another also addressed to Mail Boxes Etc. in the District of Columbia, albeit at a different District location. This one, too, contained six pots and they, too, contained heroin secreted in false bottoms. Customs found a third box, also containing six freshly-painted pots with false bottoms filled with heroin, in a Federal Express shipment in Indianapolis, Indiana. The third box had been shipped from the Philippines and was bound for yet a third Mail Boxes Etc. location in the District of Columbia. Each box contained approximately 1500 grams of heroin with a very high level of purity—approximately 90%. The heroin in each box had a street value of approximately $1 million.

Customs agents repackaged the pots in their original boxes and sent them on to Customs' Washington, D.C. area field office at Dulles Airport in Northern Virginia. There, agents reopened the boxes and installed electronic tracking devices pursuant to a warrant obtained from a federal magistrate judge in the District of Columbia. Each device emitted a radio signal with the capacity to indicate when the box was moving and to disclose when it was opened. Agents removed some of the pots from each box, and diluted the heroin in the remaining pots with flour. Telephone books were added to the boxes to compen-

1. Mail Boxes Etc. rents mailboxes with 24-hour access at numerous locations in the Washington, D.C. area and worldwide.

sate for the weight of the removed pots. The boxes were then resealed and delivered to the three Mail Boxes Etc. addresses on the shipping labels: 1429 G Street, N.W.; 4401 Connecticut Avenue, N.W.; and 5505 Connecticut Avenue, N.W.

Meanwhile, on March 4, 1998, around the time that the boxes were being shipped from Southeast Asia, a person using the name "Winston" made three telephone reservations for travel on March 9 from O'Hare International Airport in Chicago to Baltimore–Washington International Airport (BWI) in Maryland. The reservations were made in the names of "Abdul Gevemisola [sic]," "Wahab Akanni," and "Winston Gillsillian [sic]." On March 9, "Winston" made new reservations for the same three to travel on March 10. On that day, the tickets were purchased with cash because the credit card with which "Winston" initially attempted to make the purchase was reported as unverifiable. The plane arrived at BWI at 10:17 a.m., and a ticket for three travelers—later found in the pocket of Gbemisola's co-defendant Wahab Akanni—was purchased for the 12:00 p.m. "Super Shuttle" from BWI to downtown Washington, D.C. The Shuttle ride takes approximately one hour.

Just after 1:00 p.m., an individual, later identified as Gbemisola's co-defendant Winston Gillfillian, entered the Mail Boxes Etc. location at 1429 G Street, N.W. in downtown Washington. An employee testified that Gillfillian appeared to be accompanied by two other men, one of whom had a shoulder bag, who remained waiting outside. Although Gillfillian attempted to retrieve the Federal Express package, which had been delivered to a box in the name of "Aldrich Hinton," Customs had already removed it. Gillfillian left empty-handed.

A half hour later, defendant Gbemisola entered the Mail Boxes Etc. franchise at 4401 Connecticut Avenue, N.W., carrying a shoulder bag. One of the three Federal Express boxes had been addressed to the mailbox of "Anthony Brown" at that location. Gbemisola presented a notice of mail

for "Anthony Brown" and retrieved the box. Before leaving the premises, Gbemisola renewed the rental of "Brown's" box for another three months.

Gbemisola then walked out the door, and law enforcement agents watched as he entered a taxi. They followed in their own car. Almost immediately, the electronic tracking device alerted the agents that the box had been opened. The agents stopped the taxi and arrested Gbemisola. They found the Federal Express box lying open on the floor of the taxi's back seat. Inside Gbemisola's shoulder bag was the pot of heroin and the telephone books, as well as an envelope addressed to "Anthony Brown" at 4401 Connecticut Avenue, N.W. The envelope contained an auto repair estimate in the name of co-defendant Akanni.

At about the time of Gbemisola's arrest, co-defendant Akanni entered a taxi in the 4600 block of Connecticut Avenue, N.W. The third co-defendant, Gillfillian, was already in the taxi. The taxi proceeded northbound to the 5500 block of Connecticut Avenue N.W., where Akanni exited. The taxi continued and, minutes later, stopped again to let Gillfillian out. Akanni then entered the third Mail Boxes Etc. location at 5505 Connecticut Avenue, N.W., where he picked up the third Federal Express box, which had been addressed to "Cecil Dover." Like Gbemisola, Akanni renewed the rental on the box for another three months. As Akanni left the store with the box, co-defendant Gillfillian hailed a cab. Both were then arrested. Agents found documents related to the two other Mail Boxes Etc. stores on Gillfillian's person.

A grand jury returned an indictment against the three men. In Count One, all three were charged with conspiracy to distribute narcotics, in violation of 21 U.S.C. § 846. In Count Two, Gbemisola alone was charged with possession with intent to distribute a kilogram or more of heroin, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(I). In Count Three, the other

two men were charged with the same crime. The three were tried together. None of the defendants testified, and Gbemisola did not present any witnesses. During the trial, the government moved to dismiss the conspiracy charge because of discrepancies in dates listed in the indictment, and the court granted the motion. The jury found Gbemisola guilty on his remaining count, but acquitted his codefendants on theirs.

Gbemisola appeals his conviction, citing three motions that he contends the trial court erroneously denied. First, during the trial a government witness testified that although the warrant for the tracking devices had been issued by a magistrate judge sitting in Washington, D.C., the devices were actually installed in Virginia. Contending that this rendered the warrant invalid, defendant moved to suppress the evidence obtained from the use of the tracking device in the box he retrieved. Second, after the court dismissed the conspiracy count mid-trial, Gbemisola moved to sever his case from that of his codefendants. Finally, Gbemisola moved for judgment of acquittal on the ground that the evidence was insufficient to sustain the conviction.

## II

 Gbemisola's appeal of the denial of his motion to suppress does not involve any factual dispute. Both parties agree that the warrant purporting to authorize installation of the tracking device was issued in the District of Columbia, that the monitoring actually occurred in the District, but that the agents installed the device in Virginia. The only question is a legal one—whether the evidence obtained through use of the device was unlawfully obtained. We decide that question de novo. *See In re Sealed Case No. 96–3167*, 153 F.3d 759, 764 (D.C.Cir.1998).

Section 3117(a) of Title 18 of the United States Code states as follows:

> If a court is empowered to issue a warrant or other order for the installation of a mobile tracking device, such order may authorize the use of that device within the jurisdiction of the court, and outside the jurisdiction if the device is installed in that jurisdiction.

18 U.S.C. § 3117(a). Defendant contends that this statute does not empower a court to authorize the installation of a tracking device outside its jurisdiction. Although we are inclined to agree,[2] and although at

---

**2.** In fact, the statute does not appear to authorize *installation* of a tracking device at all. On its face, the statute is addressed to a court already "empowered" by some other authority to issue an order for the installation of such a device. The statute merely permits such an otherwise-empowered court to authorize the *use* of that device both inside the jurisdiction and outside the jurisdiction if the installation is made inside. *See also* SEN. REP. No. 99–541, at 33–34 (1986). Before section 3117 was enacted in 1986, courts relied on Federal Rule of Criminal Procedure 41 for the power to issue search warrants authorizing the installation and use of tracking devices. *See In re Application of the United States* ("White Truck"), 155 F.R.D. 401, 402–03 (D.Mass. 1994) (discussing historical practice); *cf. United States v. New York Tel. Co.*, 434 U.S. 159, 169–70, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977) (holding Rule 41 broad enough to authorize installation and use of pen registers). At the time, however, Rule 41 only authorized warrants issued by "a federal magistrate ...

within the district wherein the property or person sought is located," thus rendering uncertain a court's power to issue a warrant permitting the continued use of a mobile tracking device after it (and the container in which it had been placed) left the district. FED.R.CRIM.P. 41(a) (1986); *see* Clifford Fishman, *Electronic Tracking Devices and The Fourth Amendment: Knotts, Karo, and the Questions Still Unanswered*, 34 CATH. U. L.REV. 277, 375 (1985). Section 3117 resolved that uncertainty by providing the necessary authority. *See White Truck*, 155 F.R.D. at 403. In 1990, Rule 41 itself was amended to permit a magistrate to issue a search warrant not only for property within the judicial district, but also for property "either within or outside the district if the property ... is within the district when the warrant is sought but might move outside the district before the warrant is executed." FED.R.CRIM.P. 41(a); *see also id.* Advisory Committee's note on 1990 amendment (suggesting that amendment provides

oral argument the government indicated its agreement as well, that agreement does not resolve the suppression issue.

■ As is apparent on its face, section 3117 provides a basis for *authorizing* the use of a mobile tracking device. But by contrast to statutes governing other kinds of electronic surveillance devices, section 3117 does not *prohibit* the use of a tracking device in the absence of conformity with the section. *Cf.* 18 U.S.C. § 3121(a) ("Except as provided in this section, no person may install or use a pen register or a trap and trace device without first obtaining a court order...."); *id.* § 2511(1) ("Except as otherwise provided in this chapter any person who—(a) intentionally intercepts ... any wire, oral, or electronic communication ... shall be punished...."). Nor does it bar the use of evidence acquired without a section 3117 order. *Cf. id.* § 2515 (barring use as evidence of wire or oral communications intercepted in violation of statute). Indeed, the statute that bars the interception of any "electronic communication" except in conformity with its provisions expressly excludes section 3117 tracking devices from the definition of "electronic communication." *See id.* § 2510(12)(c). Similarly, the legislative history of section 3117 makes clear Congress' understanding that, under the Supreme Court's decisions in *United States v. Karo,* 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), and *United States v. Knotts,* 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), warrants are not always required for either the installation or use of mobile tracking devices. *See* H.R.Rep. No. 99–647, at 60 (1986) (noting that *Karo* held a warrant was "not required where the owner consents to installation," and that *Knotts* held the warrantless "installation of a beeper on a container to follow on a public roadway does

not violate the Fourth Amendment"). Accordingly, the question at issue in this case is whether Customs needed an authorizing warrant in the first place—or instead whether the warrant that issued, although perhaps invalid, was superfluous.

■ We conclude that the government did not require a warrant to authorize its conduct in this case. Defendant concedes that no warrant was required for the initial opening of the box, as it arrived at the border via international mail. *See United States v. Ramsey,* 431 U.S. 606, 619, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977) (holding that neither warrant nor probable cause is required for search of letters sent through international mail). As defendant further concedes, installing the tracking device did not require any additional intrusion into anyone's reasonable expectation of privacy. Without such an intrusion, there can be no Fourth Amendment violation. *See Karo,* 468 U.S. at 712–13, 104 S.Ct. 3296 (holding that placement of beeper does not violate Fourth Amendment unless reasonable expectation of privacy is infringed); *Illinois v. Andreas,* 463 U.S. 765, 771, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983) ("No protected privacy interest remains in contraband in a container once government officers lawfully have opened that container and identified its contents as illegal.").[3]

■ The remaining question is whether a warrant was required for the continuing use of the device—that is, for the electronic reports it made concerning the location and reopening of the box. In *Karo,* the Supreme Court held that a warrant was required to monitor the location of a tracking device in a private home because of the legitimate expectation of privacy within a home. *See* 468 U.S. at 714–18, 104 S.Ct. 3296. However, the Court also held that

---

authority for issuance of warrant to follow beeper across state lines).

**3.** Moreover, under the theory suggested by defense counsel in closing argument—that Gbemisola was merely picking up the box for a friend—Gbemisola would not have had the

necessary expectation of privacy in the first place. *See Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *United States v. Mangum,* 100 F.3d 164, 170 (D.C.Cir.1996).

no warrant was required for monitoring the device during the time it was en route to the house in a truck on a public road. *See id.* at 721, 104 S.Ct. 3296. Reaffirming its previous decision in *Knotts,* the Court declared that "the warrantless monitoring of an electronic tracking device ... [does] not violate the Fourth Amendment when it reveal[s] no information that could not have been obtained through visual surveillance." *Id.* at 707, 104 S.Ct. 3296.

The same analysis applies here. As Gbemisola left the Mail Boxes Etc. building, entered a taxi, and drove away, he was followed by a team of surveillance agents. Although the tracking device reported the location of the box, so too did the agents' visual surveillance. With respect to location, the device added nothing to what the agents could see with their eyes. That surveillance did not violate the Fourth Amendment, as Gbemisola "ha[d] no reasonable expectation of privacy" with respect to his travels on the public street. *Knotts,* 460 U.S. at 281, 103 S.Ct. 1081. "[S]ince the movements of the automobile and ... of the [object] containing the beeper ... could have been observed by the naked eye, no Fourth Amendment violation was committed...." *Karo,* 468 U.S. at 713–714, 104 S.Ct. 3296.

■ But, Gbemisola argues, the device also reported when the box was opened— an event that the officers did not see. The decisive issue, however, is not what the officers saw but what they could have seen. *See id.*; *Knotts,* 460 U.S. at 282, 285, 103 S.Ct. 1081. At any time, the surveillance vehicle could have pulled alongside of the taxi and the officers could have watched Gbemisola through its window. Indeed, the taxi driver himself could have seen the event simply by looking in his rear-view mirror or turning around. As one cannot have a reasonable expectation of privacy concerning an act performed within the visual range of a complete stranger, the Fourth Amendment's warrant requirement was not implicated. *See Katz v. United States,* 389 U.S. 347,

351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ("What a person knowingly exposes to the public ... is not a subject of Fourth Amendment protection.").

In sum, because no warrant was required for either the installation or use of the mobile tracking device, the fruits of that use were admissible at trial regardless of the validity of the warrant obtained by the government. *See, e.g., United States v. Martinez,* 78 F.3d 399, 401 (8th Cir.1996) (upholding search of car under automobile exception regardless of validity of warrant).

### III

Defendant's remaining two arguments, relating to the sufficiency of the evidence to sustain the verdict and to the propriety of a joint trial, merit only brief discussion.

■ We must affirm a jury's verdict if " '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *United States v. Lucas,* 67 F.3d 956, 959 (D.C.Cir. 1995) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). In making that determination, "the prosecution's evidence is to be viewed in the light most favorable to the government, drawing no distinction between direct and circumstantial evidence, and giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact." *United States v. Foster,* 783 F.2d 1087, 1088 (D.C.Cir.1986) (internal quotation omitted).

■ In the district court, defendant contended there was insufficient evidence to show anything more than that he "was picking up a box for a friend," a box the contents of which he did not know. *See* Trial Tr. at 1699 (closing argument). But the evidence recounted in Part I above— including travel to a distant city, the suspicious manner in which the three men fanned out to retrieve the three packages,

the use of false names on the mailboxes at all three locations, the defendant's renewal of the mailbox account in a false name, and the defendant's removal of the contents from the package—was more than sufficient for a reasonable jury to conclude that Gbemisola knew he was picking up a box of contraband. On appeal, defendant contends that all of this could be explained if Gbemisola had been involved in an illegal scheme to import cultural artifacts, and that it need not necessarily mean he knew the artifacts contained narcotics. Not only was this theory not offered at trial, it does not "explain" what happened in this case. The Southeast Asian shippers placed heroin in the false bottoms of the pots—in an amount (and value) the jury could reasonably have doubted they would have entrusted to recipients who thought they were merely importing artifacts, and in a location that would have been particularly risky if an "innocent" recipient had decided to use the cooking pots for their apparent purpose. *See United States v. Quilca–Carpio,* 118 F.3d 719, 722 (11th Cir.1997) (holding that reasonable jury could infer from quantity of drugs in false bottom of suitcase "that a 'prudent smuggler' is not likely to entrust such valuable cargo to an innocent person without that person's knowledge"); *United States v. Herrera,* 931 F.2d 761, 763 (11th Cir.1991) (holding that to sustain conviction it "is not necessary that the evidence exclude every" innocent explanation for lack of knowledge of drugs in false suitcase compartment); *see also United States v. Brown,* 33 F.3d 1014, 1015–16 (8th Cir.1994) (sustaining conviction where defendant used false name to pick up United Parcel Service package containing hidden narcotics).

■ Gbemisola fares no better with his attack on his joint trial. First, defendant argues that once the court dismissed the conspiracy count, there was misjoinder under Federal Rule of Criminal Procedure 8(b), which provides that:

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

In *Schaffer v. United States,* however, the Supreme Court held that if a conspiracy count makes initial joinder of defendants permissible, the mid-trial dismissal of that count does not render joinder improper under Rule 8(b). 362 U.S. 511, 514–16, 80 S.Ct. 945, 4 L.Ed.2d 921 (1960); *see United States v. Clarke,* 24 F.3d 257, 262 (D.C.Cir.1994). Indeed, even if there had never been a conspiracy count in this case, joinder of the remaining counts was proper because the government "presented evidence that [defendants'] offenses arose out of their participation in the same drug distribution scheme." *United States v. Halliman,* 923 F.2d 873, 883 (D.C.Cir. 1991); *see United States v. Perry,* 731 F.2d 985, 990 (D.C.Cir.1984). Contrary to defendant's contention, the charges in Counts Two and Three did not refer to "two discrete events which ... were separated by time, location and their participants." Def. Br. at 14. Rather, everything from the identical nature of the three boxes and their contents, to the co-defendants' joint travel, to their possession of documents in each other's names, makes clear that defendants were involved in a common scheme.

■ As joinder was proper under Rule 8(b), the remaining question is whether the district court should nonetheless have severed the defendants to avoid prejudice, as permitted by Federal Rule of Criminal Procedure 14. *See Schaffer,* 362 U.S. at 514–15, 80 S.Ct. 945; *Clarke,* 24 F.3d at 262.[4] We review the court's refus-

---

4. Rule 14 states in relevant part:

If it appears that a defendant or the government is prejudiced by a joinder of offenses

al to do so only for abuse of discretion, *see United States v. Manner*, 887 F.2d 317, 324 (D.C.Cir.1989), and we find no abuse here. All of the evidence admitted at the joint trial could properly have been admitted at a separate trial to show the nature of the drug distribution scheme in which Gbemisola was an active participant. Hence, no prejudice arose from the joinder, and the court did not err in trying the defendants together. *See Schaffer*, 362 U.S. at 514–15, 80 S.Ct. 945; *United States v. White*, 116 F.3d 903, 916–18 (D.C.Cir. 1997); *United States v. Gibbs*, 904 F.2d 52, 56 (D.C.Cir.1990).

### IV

The judgment of the district court is affirmed.

or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.
Fed.R.Crim.P. 14.