**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Alfonso HERNANDEZ, Defendant–
Appellant.**

No. 01–1624.

United States Court of Appeals,
Seventh Circuit.

Argued Aug. 8, 2001.

Decided Aug. 21, 2001.

Before Hon. RIPPLE, Hon. MANION, Hon. ILANA DIAMOND ROVNER, Circuit Judges.

## ORDER

Federal and state law enforcement officers arrested Alfonso Hernandez in possession of several boxes containing approximately 400 pounds of marijuana. At trial Mr. Hernandez argued that the government failed to prove that he knew the boxes contained a controlled substance. The jury rejected this argument and found him guilty of knowingly possessing with the intent to distribute more than 100 kilo-grams of marijuana, 21 U.S.C. § 841(a)(1), (b)(1)(B)(vii). On appeal Mr. Hernandez challenges only the sufficiency of the evidence to convict him. We affirm.

### Background

On July 31, 2000, after being alerted to the presence of suspicious packages by a local delivery company, law enforcement officers discovered six boxes containing 432.2 pounds of marijuana at the delivery company's warehouse; the boxes had been shipped from Hollywood Box and Ship, a Los Angeles, California shipping company. That same day the officers repackaged the drugs, inserting electronic devices programmed to transmit a signal should the boxes be opened, and conducted a controlled delivery of the boxes to their intended destination—Charlie's Auto Shop in Indianapolis ("Auto Shop"). Four men were present when the drugs arrived at 5:45 in the evening; two employees—Arnoldo Garcia and Rafeal Ordonez—and two men who had been waiting for the delivery since 11:00 that morning—the defendant Alfonso Hernandez and another individual named Colby Propes. Propes signed for the boxes and instructed the driver to back the delivery van in between a white car and a gold pickup so that the boxes could be unloaded into a garage located behind the main auto shop building. The hood of the pickup was raised, partially blocking observation of the delivery from the street. All four men unloaded the boxes into the garage and then closed the door. As soon as the delivery van pulled away, the men opened the door and began loading the boxes into the gold pickup. Because the pickup could hold only five boxes, Mr. Hernandez told Garcia to back the white car into the garage. The men then loaded the last box into the car. Minutes after the delivery, officers pulled over the two vehicles as they left the auto shop. The pickup, driven by Mr. Hernandez, con-

tained five of the six boxes of marijuana underneath a black tarp. The car, driven by Propes, contained the other box of drugs. None of the boxes had been opened. A police officer estimated that the shipment was worth $432,000 if sold by the pound and more if it were broken up into smaller units.

Pursuant to an immunity agreement, Garcia testified that although Mr. Hernandez and Propes did not work at the auto shop they often came there to pick up deliveries. According to Garcia, the owner of Charlie's Auto Shop also owned an automobile mechanic shop in a different part of Indianapolis. Garcia testified that he had seen Mr. Hernandez, Propes and the pickup at the mechanic shop on previous occasions but did not know whether Mr. Hernandez or Propes worked there. In Garcia's estimation, Mr. Hernandez and Propes picked up similar deliveries from the auto shop five or six times in the eight months preceding the controlled delivery. During one of the prior deliveries, Garcia smelled marijuana as he, Mr. Hernandez and Propes unloaded the shipment. Garcia inquired whether the boxes contained marijuana, and Mr. Hernandez and Propes looked at each other and laughed. On each previous occasion, Mr. Hernandez and Propes drove off with the boxes.

Employees from three freight companies corroborated Garcia's testimony regarding similar deliveries. The employees testified that in the six months leading up to the controlled delivery their companies delivered eight similar shipments to the Auto Shop. Other than one three-box shipment weighing 235 pounds, each prior shipment consisted of six to eight boxes and weighed between 409 and 626 pounds. Also, each shipment originated from the same shipping company—Hollywood Box and Ship in Los Angeles.

Frank Poskon, a detective with the Indianapolis Police Department who partici-

pated in the arrests, testified that the two employees of the auto shop, Garcia and Ordonez, had fine dust on their clothing and in their hair—dust that one would expect to find on someone who had performed body work on a car that day. In contrast, Mr. Hernandez and Propes were clean; they did not have grease stains or dust that one would expect to find on a mechanic. Detective Poskon's search of Mr. Hernandez uncovered a pager, a cell phone with a speed dial entry programmed with Propes's pager number, several identification cards with Mr. Hernandez's picture (one from California) and business cards with various phone numbers written on them including one number from Inglewood, California.

Subsequent to the arrests, a second freight company attempted to deliver seven boxes labeled "customized auto parts" to the Auto Shop. According to the driver, the delivery was refused with the explanation that the auto shop was no longer in business. The driver testified that during his subsequent deliveries that night one of the boxes fell and broke open, revealing marijuana inside.

### Standard of Review

■ Mr. Hernandez contends that the district judge erroneously denied his motion for acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. We review the judge's denial of a motion for acquittal de novo. *United States v. Crotteau*, 218 F.3d 826, 834 (7th Cir.2000). Such motions are granted only where "the evidence is insufficient to sustain a conviction." Fed.R.Crim.P. 29(a); *United States v. Jones*, 222 F.3d 349, 351–52 (7th Cir. 2000). In reviewing a sufficiency-of-the-evidence challenge, we will affirm a conviction if we determine that, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original).

### Discussion

■ This case presents a fairly common factual scenario and accompanying legal theory. The police apprehended an individual in possession of a closed container of narcotics. The individual did not admit knowledge of the container's contents, i.e., there is no direct evidence that the defendant knew about the drugs. Realizing that the government must prove that he knew that the container held a controlled substance, *see United States v. Stribling*, 94 F.3d 321, 324 (7th Cir.1996); *United States v. Covarrubias*, 65 F.3d 1362, 1369 (7th Cir.1995), the defendant argues that the government failed to prove the knowledge requirement beyond a reasonable doubt. How can the government prove its case? It is clear that the government may rely on circumstantial evidence to prove such knowledge. *See United States v. Griffin*, 150 F.3d 778, 785 (7th Cir.1998); *United States v. Scharon*, 187 F.3d 17, 22 (1st Cir.1999); *United States v. Miller*, 146 F.3d 274, 280–81 (5th Cir.1998). Otherwise the government could not convict a defendant of drug possession absent a confession. Accordingly, we must evaluate whether the circumstantial evidence in this case was sufficient for the jury to find that Mr. Hernandez knew that the boxes he drove away with after the controlled delivery contained marijuana.

■ A jury may infer a defendant's guilty knowledge based on the suspicious circumstances surrounding receipt of a drug shipment. For example, courts have noted the following circumstances as indicative of a defendant's knowledge of drugs inside a sealed package: unusual eagerness to receive the package, *see United*

*States v. Jackson*, 55 F.3d 1219, 1226 (6th Cir.1995); attempts to conceal the packages during/after delivery, *see United States v. Washington*, 586 F.2d 1147, 1152–53 (7th Cir.1978); *United States v. Johnson*, 57 F.3d 968, 972 (10th Cir.1995); *cf. United States v. Alarape*, 969 F.2d 349, 350 (7th Cir.1992) (hiding package in closet after opening it); *cf. United States v. Hernandez*, 218 F.3d 58, 66–67 (1st Cir. 2000) (evasive maneuvers during delivery, e.g., unnecessary u-turns and driving without headlights), the presence of pagers, cell phones and other tools of the drug trade, *see United States v. Duarte*, 950 F.2d 1255, 1260 (7th Cir.1991); *United States v. Lazcano–Villalobos*, 175 F.3d 838, 844 (10th Cir.1999), and the value of the shipment, *see United States v. Uriostegui–Estrada*, 86 F.3d 87, 89 (7th Cir.1996) (drug dealer not likely to trust unsuspecting individual with $1.1 million of heroin); *Alarape*, 969 F.2d at 350–51 (same—782 grams of heroin); *United States v. Garcia–Flores*, 246 F.3d 451, 455 (5th Cir. 2001) (same—300 pounds of marijuana); *United States v. Gbemisola*, 225 F.3d 753, 760 (D.C.Cir.2000) (same—$1 million of heroin). Additionally, knowledge that a particular substance is a narcotic can be proved through evidence of similar previous drug transactions by the defendant. *See* Fed.R.Evid. 404(b); *United States v. Jones*, 248 F.3d 671 (7th Cir.2001).

■ The circumstantial evidence in this case was sufficient to prove beyond a reasonable doubt that Mr. Hernandez knew that he possessed marijuana. Mr. Hernandez and Propes waited more than 6½ hours for a delivery of boxes to an automobile body shop that did not employ them. Mere minutes after the delivery arrived, they unloaded the boxes and then promptly re-loaded them into two waiting vehicles, concealing the boxes in the pickup truck under a black tarp. During the

delivery, the hood of the pickup was raised, blocking observation of the loading and unloading of the boxes from the street. Nothing was removed from the boxes at the delivery address. In addition to a marijuana shipment valued at nearly a half-million dollars, Mr. Hernandez possessed a pager and a cell phone. Moreover, these suspicious circumstances were not isolated to the controlled delivery. Garcia testified that Mr. Hernandez and Propes had picked up five or six similar deliveries in the eight months prior to the controlled delivery. Garcia also testified that he smelled marijuana during one of the prior shipments and that when he asked Mr. Hernandez and Propes whether the delivery was marijuana they both laughed. Partially corroborating Garcia's testimony, employees of three shipping companies testified that their companies delivered eight similar shipments to Charlie's Auto Shop in the six months leading up to the controlled delivery. Finally, two pieces of evidence connected Mr. Hernandez to the state-of-origin of the drug shipment: his California identification card and the Inglewood, California phone number—a number from a town less than 20 miles from where the drugs were shipped. Based on this evidence we conclude that a rationale jury could have found Mr. Hernandez guilty beyond a reasonable doubt.

■ In light of the government's reliance on Garcia's testimony regarding the prior suspicious shipment, Mr. Hernandez first argues that the government's evidence failed to prove he knew that the prior shipment contained marijuana. Mr. Hernandez does not dispute that Garcia smelled marijuana during the previous delivery, that Garcia asked him whether the prior shipment was marijuana or that he laughed in response to Garcia's question. Instead he argues that these facts are inconclusive. Mr. Hernandez states that it is *possible* that the marijuana odor came from other boxes in the delivery van, not

the specific boxes he unloaded at the auto shop. He also points out the possibilities that he may not have been standing close enough to detect the same odor and that Garcia may have asked his question about the marijuana in English—a language Mr. Hernandez purportedly does not understand as evidenced by his use of a courtroom interpreter. Finally, Mr. Hernandez contends that his laughter was ambiguous—it could have meant many things other than knowledge of illegality. But when reviewing a conviction for sufficiency of the evidence, affirmance does not require that the government's evidence disprove every conceivable hypothesis of innocence. *See United States v. Ytem,* 255 F.3d 394 (7th Cir.2001); *United States v. Theodosopoulos,* 48 F.3d 1438, 1451 (7th Cir.1995). Thus, whether Mr. Hernandez can conceive of innocent explanations for the evidence is irrelevant. Viewing the evidence in the light most favorable to the government, we ask only whether a rational jury could have convicted the defendant—not whether the jury should have reached that conclusion. *See United States v. Bomski,* 125 F.3d 1115, 1117 (7th Cir.1997).

We conclude that a rational jury could have reasonably determined that Mr. Hernandez knew the prior shipment contained marijuana and, thus, they could have reasonably inferred that he knew the controlled delivery also contained drugs. Garcia testified both that he smelled the marijuana when the back of the delivery van was opened and that Mr. Hernandez unloaded boxes from the delivery van. Although it is possible that Mr. Hernandez did not smell the marijuana—perhaps he has an inferior sense of smell—the jury could reasonably infer otherwise (especially given that Mr. Hernandez did not present any evidence that he has a sub-par olfactory sense). *See United States v. Gant,* 119 F.3d 536, 540 (7th Cir.1997); *United States v. Gourley,* 168 F.3d 165,

169 (5th Cir.1999). Furthermore, Garcia specifically questioned Mr. Hernandez about the marijuana and Mr. Hernandez laughed. Given that the question was posed in the presence of a marijuana odor, the jury could reasonably infer that Mr. Hernandez's laughter indicated knowledge of the illegal contraband.

Mr. Hernandez next argues that this case is analogous to *United States v. Baker*, 499 F.2d 845 (7th Cir.1974), a case in which we found the evidence insufficient to sustain a narcotics conspiracy. In that case, Ralph Vela drove Rick Felts to a motel room where Felts purchased drugs. Vela then drove Felts away from the sale. There was no evidence that Vela discussed the drug deal beforehand or that he was present when the deal was made. In *Baker*, we held that "[t]he driving of a car in which one of the conspirators ... rode was insufficient evidence from which a jury could reasonably infer that Vela intended to participate in the conspiracy or knew of the conspiracy and associated himself with it," *id.* at 849 (internal quotation marks and citation omitted), reasoning that mere presence of the defendant at a drug transaction is not enough to sustain a conviction; there must be facts from which the jury can infer a defendant's criminal purpose, *id.* at 848. Here there is evidence that Mr. Hernandez (1) possessed drugs with a wholesale value greater than $400,000, (2) knew that he recently possessed marijuana under similar conditions, (3) attempted to conceal his illegal activities, and (4) possessed a pager and a cell phone with a speed dial entry to his cohort's pager. Additionally, there were other suspicious circumstances surrounding the drug delivery. Mr. Hernandez waited most of the day for a delivery at a business that did not employ him. When the shipment arrived he and others unloaded the boxes, loaded them into other vehicles and left within a matter of minutes. He had a California identification card and a business card with a Los Angeles area phone number written on it—both of which connected him to the area where the drug shipment originated. Unlike the *Baker* case, here the government presented sufficient evidence from which a rational jury could have found the defendant guilty beyond a reasonable doubt.

Based on the foregoing, we affirm Mr. Hernandez's conviction.