10-4104-cr
United States of America v. Deitron Davis

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term 2012

(Argued: February 27, 2012      Decided: August 24, 2012)

Docket No. 10-4104-cr

-------------------------------------------------------x

UNITED STATES OF AMERICA,

Appellee,

-- v. --

DEITRON DAVIS,

Defendant-Appellant.

-------------------------------------------------------x

B e f o r e :  WALKER, LYNCH and DRONEY, Circuit Judges.

Appeal from a judgment of the United States District Court for the Eastern District of New York (Frederic Block, Judge) convicting defendant of narcotics offenses and resisting arrest. Appellant challenges his convictions as based on insufficient evidence. We AFFIRM in part and VACATE in part, and REMAND for further proceedings.

> BRUCE R. BRYAN, Syracuse, NY, for Appellant.
>
> THOMAS M. SULLIVAN, Assistant U.S. Attorney for the Eastern District of New York (Susan Corkery, on the brief), for Loretta E. Lynch, U.S. Attorney for the Eastern District of New York, for Appellee.

JOHN M. WALKER, JR., Circuit Judge:

Defendant-Appellant Deitron Davis appeals from a judgment of the United States District Court for the Eastern District of New York (Frederic Block, Judge), following a jury trial, convicting him of narcotics offenses and resisting arrest. On appeal, Davis argues that (1) there was no evidence from which a jury could make the requisite finding that he knew that the criminal scheme at issue involved narcotics distribution, and (2) evidence that he fled from the police and struggled against being handcuffed did not support a conviction for misdemeanor resisting arrest. We hold that the evidence supported Davis's convictions for the narcotics charges but not for resisting arrest. We therefore AFFIRM as to the former charges but VACATE and REMAND with instructions to dismiss the latter.

**BACKGROUND**

**I.   Factual Background**

The evidence at trial demonstrated the following:

On June 2, 2008, employees of Forward Air shipping company's Columbus, Ohio branch received certain damaged crates that were in transit from Phoenix, Arizona, to JFK Airport in New York City. In accordance with company policy, the employees opened the packages and discovered what appeared to be plastic-wrapped bales of marijuana. Forward Air's records revealed that the shipment had been sent from Phoenix by "Carl Paplow." The bill of lading stated that the consignee was "Robert Francis" and that

2

the crates contained "rims, tires and accessories, [and] audio parts," Appendix ("App.") 23. The employees reported their discovery to local authorities, who contacted the DEA's New York office. The DEA requested that the crates be sent on to their destination in the normal course for a controlled delivery.

The crates arrived at JFK on June 3 and Forward Air turned them over to local DEA agents. The agents searched the crates pursuant to a warrant and discovered 258 kilograms of marijuana. They removed the marijuana, re-weighted the crates and returned them to Forward Air's JFK branch. While the crates were in DEA custody, someone (apparently not Davis) sought to retrieve the shipment from Forward Air's JFK branch using a driver's license for "Robert Francis," but was turned away as the crates were not then available.

On June 3, the day the crates arrived in New York, Davis's friend Kieama Hyman and her friend Sherelle (whose last name does not appear in the record) called Davis, looking for something to do. Davis picked the two women up in his black Nissan Maxima and drove to his cousin's house nearby. According to Hyman, Davis "started driving crazy" as he neared the house, App. 71, which Hyman interpreted as Davis trying not to be seen. Once they arrived at the house, Davis went inside while the two women waited in the car. Davis returned and asked Hyman whether she had identification. When she responded that she did, Davis asked her if she would help pick up some rims for his car. Hyman

3

agreed. Before they left Davis's cousin's house, Davis switched cars to a gold Toyota Avalon. He claimed that the rims would not fit inside the Maxima, though Hyman did not think the Avalon was much bigger. Davis drove Hyman and Sherelle to a nearby Home Depot. He then left the car and spoke to a man in a white van for about five minutes. He returned to the Avalon and, accompanied now by the white van, proceeded to Forward Air's JFK facility. According to a surveillance officer at the facility, Davis "drove back and forth at least twice" before parking in front of Forward Air. App. 52.

After stopping at Forward Air, Davis left the Avalon and spoke once more with the driver of the white van. He then gave Hyman a copy of the bill of lading for the shipment and told her to go in and pick up the rims. Hyman and Sherelle went inside, where Hyman presented the bill of lading and her identification and signed some paperwork. The driver of the white van then pulled up to the Forward Air bay and loaded the crates inside. Once the crates were loaded in the van, Davis and the two women drove off in the Avalon, followed by the white van -- and by DEA agents.

Circling the blocks, Davis remarked that they were being followed. He pulled over and shouted at Hyman and Sherelle to get out of the car. As they did, Davis said he would be back to pick them up and drove off. The agents then turned on their strobe lights; the white van pulled over but Davis sped off in the Avalon.

4

The officers arrested Hyman and Sherelle. While under arrest, Hyman received a phone call from Davis which she answered at the officers' instruction. Davis said he would pick the two women up at a nearby intersection, but to make sure they were not followed. Hyman and Sherelle walked towards the intersection, where an agent observed Davis walking nearby.

The agent who saw Davis identified himself and drew his weapon, at which point Davis ran. The agent chased Davis for approximately ten minutes, during which time Davis ignored many commands to stop and the agent several times caught up with and struck Davis -- a large man at six feet seven inches -- with his baton. Davis did not fight back. Eventually, other agents joined the chase and tackled Davis. While pinned stomach-down on the ground, Davis placed his hands under his body and was "fighting [and] resisting" against being handcuffed for one or two minutes, App. 123, though he ultimately was subdued, handcuffed and arrested. There was no evidence that Davis threatened or struck out at any of the agents.

After arresting Davis, the agents searched him and recovered, inter alia, his driver's license and a Jet Blue Airways receipt listing Davis as a passenger on a May 6, 2008 flight from Phoenix to JFK. They later confirmed with Jet Blue that Davis had been on that flight and that he previously had flown from JFK to Phoenix on May 2. They also learned that before Davis had boarded the May 2 flight, an FBI agent had asked

him why he had no carry-on or checked luggage.  Davis had responded that he planned to buy clothes in Phoenix.

Davis was interviewed by DEA agents after his arrest.  Among other things, he claimed not to have heard of or been to Forward Air.

**II.  Procedural Background**

Davis was tried for conspiracy to distribute marijuana in violation of 21 U.S.C. §§ 841(b)(1)(B)(vii) and 846; attempting to possess marijuana with intent to distribute in violation of 21 U.S.C. § 841 (b)(1)(B)(vii); and the misdemeanor of resisting arrest in violation of 18 U.S.C. § 111(a)(1).  A jury convicted him on all three counts.  Hyman, Sherelle and the driver of the white van were not charged because there was no evidence contradicting their claims that they were unaware that the crates contained marijuana.

Davis moved for a judgment of acquittal under Fed. R. Crim. P. 29.  With regard to the narcotics convictions, he argued that "there was insufficient evidence that he knew that the shipment contained a controlled substance."  Special Appendix ("S.A.") 2. The district court disagreed:

> [T]he evidence, taken in the light most favorable to the government, . . . established, <u>inter alia</u>, that Davis traveled to Arizona (the source of the shipment) less than a month before the shipment arrived; that he possessed a bill of lading for the shipment (albeit under another name); and that he told [Hyman] that he was excited to go pick up "his rims."  A jury could reasonably infer from those facts that Davis traveled to Arizona to arrange the shipment and, therefore, that he was the intended recipient of the shipment.

*Id.* at 3.  As to his conviction for resisting arrest, Davis pointed out that the government had offered no evidence that Davis had directed any force at the arresting officers.  He contended that evidence demonstrating only that he had not yielded to arrest was legally insufficient for a conviction.  The district court rejected this argument as well, concluding that Davis's willful use of physical force in making it difficult for officers to handcuff him permitted a conviction for resisting arrest.

The district court entered a judgment of conviction on all counts and sentenced Davis principally to a 60-month term of imprisonment.  Davis appeals from that judgment on the grounds raised in his Rule 29 motion.

**DISCUSSION**

**I.   Standard of Review**

"We review challenges to evidentiary sufficiency de novo, 'view[ing] the evidence presented in the light most favorable to the government, and . . . draw[ing] all reasonable inferences in its favor.'"  United States v. Szur, 289 F.3d 200, 219 (2d Cir. 2002) (quoting United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000)).  "A defendant challenging the sufficiency of the evidence supporting a conviction faces a heavy burden."  United States v. Glenn, 312 F.3d 58, 63 (2d Cir. 2002) (internal quotation marks omitted).  We must uphold the conviction as long as "any rational trier of fact could have found the essential

7

elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

**II.  Convictions for the Narcotics Offenses**

With regard to Davis's convictions for conspiring to distribute marijuana and attempting to possess marijuana with intent to distribute, the question before us is straightforward: Was the evidence at trial legally sufficient to support a finding that Davis knew that the shipped crates contained a controlled substance?

To prove that a person possessed a controlled substance with intent to distribute, the government must prove "that the defendant knew he was dealing with a controlled substance." United States v. Torres, 604 F.3d 58, 65-66 (2d Cir. 2010).  The same holds true for drug conspiracy charges.  See id. at 66.  The government need not prove that the defendant knew the specific drug at issue, but only that he was dealing with some controlled substance.  See United States v. Morales, 577 F.2d 769, 776 (2d Cir. 1978).

On appeal, as he did in his Rule 29 motion before the district court, Davis relies on a line of this Court's decisions reversing convictions for insufficient evidence that the defendant knew the specific object of the criminal scheme at issue.  For example, in United States v. Ogando, 547 F.3d 102 (2d Cir. 2008), this Court reversed the conviction of a taxi driver who was scheduled to pick up a drug smuggler at an airport.  We

8

held that the evidence -- which consisted of the defendant's presence at the airport, earlier presence at another airport where another co-conspirator was arrested, and associations with certain other co-conspirators -- "simply show[ed] that [defendant] was a livery cab driver regularly used by members of this conspiracy." Id. at 108; see also Torres, 604 F.3d at 70-71 (defendant's suspicious behavior in attempting to take delivery of narcotics shipment did not indicate knowledge that the shipment contained drugs); United States v. Lorenzo, 534 F.3d 153, 160-61 (2d Cir. 2008) (defendant's periodic involvement with conspirators, including transferring money to one, was indicative of illegal behavior but did not demonstrate knowledge that the conspiracy involved narcotics); United States v. Rodriquez, 392 F.3d 539, 546-48 (2d Cir. 2004) (evidence demonstrated only that defendant served as a lookout for some sort of illicit transaction, not that he knew it was a drug transaction specifically); United States v. Friedman, 300 F.3d 111, 126 (2d Cir. 2002) (evidence of calls between conspirator and defendant, and that defendant furnished guns to conspirator, did not demonstrate that defendant knew that the object of the conspiracy was extortion); United States v. Samaria, 239 F.3d 228, 236-38 (2d Cir. 2001) (gypsy cab driver's presence in car with conspirators, and assistance with loading non-transparent boxes containing stolen credit card information, did not demonstrate knowledge of conspiracy to commit credit card fraud), abrogated

9

on other grounds, United States v. Huezo, 546 F.3d 174, 180 n.2 (2d Cir. 2008).

In each of these cases, save Torres, the defendant played a role subordinate to that of the principal engaged in the criminal conduct charged, and the defendant plausibly could have fulfilled that role without knowing the scheme's criminal nature.  That is, it is conceivable that the criminal enterprises at issue could have functioned as planned without the requisite criminal knowledge of the taxi driver (Ogando), the money transferor (Lorenzo), the lookout (Rodriquez), the frequent caller and gun supplier (Friedman), and the driver and box loader (Samaria). This case is easily distinguishable from those cases, in which the overall circumstances of each case did not support a finding beyond a reasonable doubt that the defendant had the requisite knowledge.  The evidence in this case established, either directly or by inference, that Davis played a principal role, even a managerial one, in the drug conspiracy and for that reason would have reasonably possessed the requisite criminal knowledge.

Torres, 604 F.3d 58, in which we reversed a conviction for conspiracy to distribute cocaine, presented a factual scenario closer to this one.  Davis relies upon it to argue that the evidence here is insufficient to prove his knowledge that the Forward Air packages contained a controlled substance.  In Torres, the defendant Torres and several other men, in suspicious fashion, had attempted to receive a UPS delivery of certain bulky packages addressed to Torres.  They greeted the deliveryman

outside the destination address, presented a driver's license for Torres that listed him as living at a different address, and followed the deliveryman after he refused to turn over the packages. Eventually, UPS and the police discovered that the packages contained cocaine and staged a controlled delivery at a UPS store. Once again, Torres suspiciously attempted to receive the packages, and this time was arrested. Reviewing his conviction, this Court concluded that the evidence supported findings that "Torres had a connection with the Packages" and that, based on his suspicious behavior, he "was most likely aware that the Packages contained contraband of some kind." Id. at 69. But the record did not contain "any evidence that Torres knew the Packages contained narcotics," such as "evidence as to the nature of Torres's associations with the persons who shipped the cocaine or with the persons who expected to distribute it." Id. at 70-71. Because "[t]here was no evidence of any conduct by Torres other than his efforts to gain possession of the Packages," this Court held that there was no evidence that Torres knew of the Packages' contents. Id. at 71.

There may be tension between Torres and decisions in other circuits as to whether an inference of guilty knowledge may be drawn from suspicious behavior of an intended recipient of a narcotics package. See United States. v. Hernandez, 17 F. App'x 464, 467 (7th Cir. 2001) (collecting cases for the proposition that "[a] jury may infer a defendant's guilty knowledge based on the suspicious circumstances surrounding receipt of a drug

11

shipment"); see also, e.g., United States v. Hernández, 218 F.3d 58, 66-67 (1st Cir. 2000) (affirming convictions based on, inter alia, the facts that one defendant was the intended recipient of the shipment and thereafter controlled the packages, and another defendant drove evasively after taking possession of the packages); United States v. Gbemisola, 225 F.3d 753, 759-60 (D.C. Cir. 2000) ("The Southeast Asian shippers placed heroin in the false bottoms of the pots -- in an amount (and value) the jury could reasonably have doubted they would have entrusted to recipients who thought they were merely importing artifacts, and in a location that would have been particularly risky if an 'innocent' recipient had decided to use the cooking pots for their apparent purpose."); United States v. Brown, 33 F.3d 1014, 1015-16 (8th Cir. 1994) (affirming the conviction of a defendant who tried to take receipt of a UPS delivery of drugs in facts resembling those in Torres); cf. United States v. Quilca-Carpio, 118 F.3d 719, 722 (11th Cir. 1997) ("[A] prudent smuggler is not likely to entrust such valuable cargo to an innocent person without that person's knowledge." (internal quotation marks omitted)). But cases of this sort are fact-dependent. In this case, we have no doubt, based on all the evidence, that the jury permissibly could have inferred Davis's guilty knowledge.

First, the evidence here did not link Davis only to the receipt of the drugs but also to their initial shipment. Davis, traveling without luggage, flew from New York to Phoenix, where the shipment originated, a month before he attempted to receive

the crates.  Viewing that evidence in the light most favorable to the government and as the district court correctly concluded, "[a] jury could reasonably infer . . . that Davis traveled to Arizona to arrange the shipment."  S.A. 3.  And because it logically can be inferred that one who arranges a shipment knows its contents, the jury here easily could have found from the totality of the evidence that Davis knew precisely what was in the shipped packages.

Second, as noted earlier, the evidence showed that Davis had an authoritative role in the criminal scheme.  See United States v. Cruz, 363 F.3d 187, 199 (2d Cir. 2004) (a jury may reasonably infer guilty knowledge from evidence that the defendant exercised authority within the conspiracy itself); Samaria, 239 F.3d at 235 (same).  He controlled the circumstances surrounding the pick up -- choosing when to pick up the crates, how to pick up the crates, and who would pick up the crates.  Specifically, Davis recruited Kieama Hyman and her friend to pick up the crates even though he easily could have done so himself; switched cars at his cousin's house; directed Hyman to use her identification to retrieve the crates from Forward Air; and it appears that he obtained a van with a driver to pick up the crates.  See United States v. Medina, 32 F.3d 40, 44 (2d Cir. 1994) (affirming conviction in part because defendant approved participation of an additional co-conspirator and supplied a gun); United States v. Tussa, 816 F.2d 58, 63 (2d Cir. 1987) (affirming conviction of defendant who took part in the negotiations leading to a drug delivery).

Third, the evidence showed that Davis concealed his involvement in the criminal conspiracy: the crates were not addressed to him (but to "Robert Francis"); he recruited another person without knowledge of the true contents of the crates to pick them up; and he lied to this person by telling her that he did not have his driver's license even though he did.  This evidence supports an inference of Davis's knowledge of the crates' contents.  See, e.g., Hernandez, 218 F.3d at 66 ("That the name of the consignee was fabricated" supported the conclusion that the defendant knew the container's contents.); United States v. Johnson, 57 F.3d 968, 972 (10th Cir. 1995) ("Similarly probative of [defendant's] guilty knowledge is the fact that [defendant] listed on the airbill a false name and nonexistent address for the package's destination.").  These facts, along with the fact that the bill of lading identified the recipient as "Robert Francis" rather than Davis, and a person claiming to be "Robert Francis" first tried to retrieve the crates, are inconsistent with Davis's statements to Hyman that the crates contained rims for his car.

Finally, Davis's possession of the bill of lading supports an inference that he had the requisite knowledge.  For one, taken together with his recruitment of select people, it gave him not only the "prospect[] of having sole dominion over the [crates]," see Torres, 604 F.3d at 71, but sole dominion itself.  Furthermore, as we previously have observed, "possession of documents relat[ing] to the crime" may support an inference of

14

knowledge.  Cruz, 363 F.3d at 199; see also Samaria, 239 F.3d at 235 (same).

Taken together, these circumstances easily permitted an inference that Davis, far from being an unwitting courier for a drug-distribution conspiracy, was a willing (if not central) participant who knew that the shipment contained narcotics.  See United States v. Stewart, 485 F.3d 666, 671 (2d Cir. 2007) (collecting cases for the proposition that a defendant's guilty knowledge "may be established through circumstantial evidence").  We therefore have no difficulty affirming Davis's convictions on the narcotics counts.

**III. Conviction for Resisting Arrest**

The conviction for resisting arrest, however, presents a different picture.  18 U.S.C. § 111 provides:

(a) In general.--Whoever--

(1) forcibly assaults, resists, opposes, impedes, intimidates, or interferes with [a U.S. officer or employee] while engaged in or on account of the performance of official duties . . .

shall, where the acts in violation of this section constitute only simple assault, be fined under this title or imprisoned not more than one year, or both, and where such acts involve physical contact with the victim of that assault or the intent to commit another felony, be fined under this title or imprisoned not more than 8 years, or both.

(b) Enhanced penalty.--Whoever, in the commission of any acts described in subsection (a), uses a deadly or dangerous weapon (including a weapon intended to cause death or danger but that fails to do so by reason of a defective component) or inflicts bodily injury, shall be fined under this title or imprisoned not more than 20 years, or both.

15

Davis was tried and convicted under the misdemeanor clause in Section 111(a).  We therefore must decide whether the evidence permitted the jury to find, beyond a reasonable doubt, that Davis "forcibly assault[ed], resist[ed], oppose[d], impede[d], intimidate[d], or interfere[d] with [a U.S. officer or employee] while engaged in or on account of the performance of official duties" and, in doing so, committed "simple assault."

**A.   "Simple Assault" Under Section 111(a)**

In United States v. Chestaro, 197 F.3d 600 (2d Cir. 1999), we considered a vagueness challenge to the predecessor version of Section 111, which was identical to the current version in relevant part.[1]  The appellant in that case argued that "simple assault," which delineates misdemeanor conduct, was not clearly defined and that the statute therefore did not sufficiently distinguish between misdemeanors and felonies.  We disagreed.  We noted "'the settled principle of statutory construction that, absent contrary indications, Congress intends to adopt the common law definition of statutory terms.'"  Id. at 605 (quoting United States v. Shabani, 513 U.S. 10, 13 (1994)).  We also pointed out that the term "simple assault" appears elsewhere in the U.S. Code -- in 18 U.S.C. § 113 -- and that it had "been held to 'embrace the common law meaning'" in that context.  Chestaro, 197 F.3d at

---

[1]   Section 111(a)'s felony clause, not at issue here, previously provided that "in all other cases, [the perpetrator] would be fined under this title or imprisoned not more than three years, or both."  In 2002, Congress boosted the maximum prison term for the felony to eight years.  And in 2008, Congress replaced "in all other cases" with the language "where such acts involve physical contact with the victim of that assault or the intent to commit another felony."

16

605 (quoting United States v. Stewart, 568 F.2d 501, 504 (6th Cir. 1978)).  We therefore held that "simple assault," as used in Section 111(a), incorporated the established common law definition of the phrase: a crime, not involving touching, "committed by either a willful attempt to inflict injury upon the person of another, or by a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm."  Chestaro, 197 F.3d at 605, 606 (internal quotation marks omitted); see also United States v. Vallery, 437 F.3d 626, 631 (7th Cir. 2006) ("Under the common law, physical contact is the line of demarcation between simple assault and battery.").

Following Chestaro, we clarified that "simple assault" retains its common law definition in the context of the current version of Section 111(a).  See United States v. Hertular, 562 F.3d 433, 440 (2d Cir. 2009).  Thus, for a defendant to be guilty of the misdemeanor of resisting arrest under Section 111(a), he necessarily must have committed common law simple assault.  See id.

We recognize that there is disagreement among the federal courts of appeals in interpreting Section 111(a)'s use of "simple assault."  The main problem, as explained by the Ninth Circuit, is that Section 111(a) "appears to prohibit six different types of actions" -- assaulting, resisting, opposing, impeding, intimidating and interfering -- "only one of which is 'assault,' but then it draws the line between misdemeanors and felonies solely by referencing the crime of assault."  United States v.

17

*Chapman*, 528 F.3d 1215, 1218-19 (9th Cir. 2008). "Therefore, it is unclear whether the statute prohibits acts of resistance, opposition, impediment, intimidation, or interference that do not also involve an underlying assault." *Id.* at 1219. Several of our sister circuits have taken the same approach as, or similar approaches to, this Court -- namely, requiring some form of common law simple assault for Section 111(a) misdemeanor convictions. See *Chapman*, 528 F.3d at 1218-22; *Vallery*, 437 F.3d at 630-34; *United States v. Hathaway*, 318 F.3d 1001, 1008-09 (10th Cir. 2003).

But two circuits have taken a different approach. In *United States v. Gagnon*, 553 F.3d 1021 (6th Cir. 2009), the Sixth Circuit, interpreting the predecessor version of Section 111, opined that the approach taken by this Court and others "disregards five of the six actions Congress specifically delineated" and thus makes "a great deal of what § 111 does say entirely meaningless." *Id.* at 1026. That court therefore held that in the context of Section 111(a), "simple assault" is not limited to its common law meaning, but is "a term of art that includes the forcible performance of any of the six proscribed actions in § 111(a) without the intent to cause physical contact or to commit a serious felony." *Id.* at 1027 (emphasis omitted). Construing the current version of Section 111, the Fifth Circuit followed the Sixth Circuit's lead. See *United States v. Williams*, 602 F.3d 313, 317 (5th Cir. 2010). The Fifth Circuit reasoned that the Sixth Circuit's reading "avoid[s] rendering superfluous the other five forms of conduct proscribed by

18

§ 111(a)(1)." Williams, 602 F.3d at 317. That court also found it "more consonant with the dual purpose of the statute, which, the Supreme Court has noted, is not simply to protect federal officers by punishing assault, but also to 'deter interference with federal law enforcement activities' and ensure the integrity of federal operations by punishing obstruction and other forms of resistance." Id. (quoting United States v. Feola, 420 U.S. 671, 678 (1975)).

While we do not find this reasoning to be without basis, we ultimately are not persuaded by it. First, as in any task of statutory construction, "[w]e begin with the statute's text." United States v. Lyttle, 667 F.3d 220, 223 (2d Cir. 2012). And as we noted in Chestaro, it is well-settled that "where a federal criminal statute uses a common-law term of established meaning without otherwise defining it, the general practice is to give that term its common-law meaning." United States v. Turley, 352 U.S. 407, 411 (1957); see Chestaro, 197 F.3d at 605. In defining misdemeanor conduct under Section 111(a), Congress chose to use the specific phrase "simple assault," which as noted earlier has a longstanding and precise meaning under the common law.

Second, not only does "simple assault" have an established common law meaning, it does not appear to have a contrary meaning in the vernacular, the U.S. Code or anywhere else. It therefore would have been a peculiar phrase for Congress to employ for some other, unspecified meaning -- especially after courts had assigned the phrase its common law meaning in the context of Section 113. See United States v. Delis, 558 F.3d 177, 183 (2d

19

Cir. 2009).  Indeed, so far as we can tell, no court, except for the Fifth and Sixth Circuits in construing this law, has ever understood "simple assault" as "'a term of art that includes the forcible performance of [assaulting, resisting, opposing, impeding, intimidating, or interfering] without the intent to cause physical contact or to commit a serious felony.'"  See Williams, 602 F.3d at 317 (quoting Gagnon, 553 F.3d at 1027) (emphasis omitted).  And our textual analysis gives us no reason to believe that Congress had that understanding.

Third, it bears noting that Congress continued its use of "simple assault" in Section 111(a) when it amended the statute in 2008.  That amendment preceded the Fifth and Sixth Circuit's interpretation of "simple assault" discussed earlier.[2]  Indeed, it appears that every court to have interpreted Section 111(a)'s use of "simple assault" before Congress amended the statute gave the phrase its common law meaning.[3]  One would think that

---

[2]   Although the Sixth Circuit interpreted the predecessor version of Section 111 in Gagnon, Congress had already amended the statute when that case was decided.  See 553 F.3d at 1024 n.2.

[3]   In Gagnon, the Sixth Circuit relied partly on the Eighth Circuit's earlier statement that "in the context of § 111, the definition of simple assault is conduct in violation of § 111(a), which does not involve actual physical contact, a dangerous weapon, serious bodily injury, or the intent to commit murder or another serious felony."  United States v. Yates, 304 F.3d 818, 822 (8th Cir. 2002); see also Gagnon, 553 F.3d at 1026 n.6.  In Yates, however, the Eighth Circuit made clear that it adopted the common law meaning of "simple assault" and only then used the language contained in a neighboring statute to limit the definition further.  See Yates, 304 F.3d at 821-22.  In other words, the Eighth Circuit narrowed the common law meaning of "simple assault" for purposes of Section 111(a); it did not expand that meaning to include Section 111(a)(1)'s five remaining acts.

Congress, in amending the statute, would have corrected such a broad misreading had one existed.

Furthermore, we do not believe, as the Fifth and Sixth Circuits have worried, that ascribing "simple assault" its common law meaning "render[s] superfluous the [non-assault] forms of conduct proscribed by § 111(a)(1)." Williams, 602 F.3d at 317. While we are not called upon today to interpret Section 111(a)'s felony clause, we note that the statute's five non-assault acts would appear to be criminally prohibited by the felony clause "where such acts involve . . . the intent to commit another felony." Thus, our interpretation does not necessarily run afoul of the preference against "interpretations of statutes that render language superfluous." Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253 (1992).[4]

**B.   Davis's Conduct**

To be guilty of the misdemeanor of resisting arrest, Davis must have, inter alia, committed common law simple assault: a crime, not involving touching, "committed by either a willful attempt to inflict injury upon the person of another, or by a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable

---

[4]   We recognize that the Fifth and Sixth Circuits' interpretation of "simple assault," as a broad "term of art" encompassing all of the actions listed in Section 111(a)(1), would better "deter interference with federal law enforcement activities," which the Supreme Court has identified as part of Congress's intention in enacting Section 111. See Feola, 420 U.S. at 678. But we believe that the plain text of Section 111 and the other considerations described above command the interpretation that we have given it.

21

apprehension of immediate bodily harm." Chestaro, 197 F.3d at 605 (internal quotation marks omitted).

The evidence adduced at trial did not permit such a finding. It showed only that Davis ran from a DEA agent and, when ultimately tackled to the ground, struggled against being handcuffed -- primarily by putting his hands under his stomach. While one of the arresting agents (the one who had chased Davis on foot) testified on direct examination that Davis was "fighting" during his arrest, App. 123, any suggestion that Davis was striking blows, rather than more passively resisting being handcuffed, was retracted by the agent. On cross-examination, the agent testified that (1) Davis did not punch or attack anyone during his arrest, (2) Davis was "using his muscles to avoid having the hands forced behind his back to be cuffed," App. 131-32, and (3) certain injuries to the agent resulted from a fall during the chase and not from any aggressions by Davis. Thus, there was no evidence that Davis engaged in any conduct whatsoever that demonstrated a desire to injure an agent or would cause an agent to apprehend immediate injury.

Davis's conviction for resisting arrest therefore must be overturned.

**CONCLUSION**

For these reasons, we AFFIRM the judgment of the district court with respect to Davis's convictions on the narcotics counts, but VACATE his conviction for resisting arrest. We REMAND with directions to dismiss the Section 111(a) count and for resentencing consistent with this opinion.

22