05-1989
USA v. Stewart

_____

UNITED STATES OF AMERICA,

Appellee,

- v. -

HUMPHREY STEWART,

Defendant-Appellant.
_____

Before: KEARSE and SOTOMAYOR, Circuit Judges, and KOELTL, District Judge[*].

Appeal from a judgment of the United States District Court for the Eastern District of New York, Raymond J. Dearie, Judge, convicting defendant on eight counts of racketeering, firearms, and narcotics violations, see 18 U.S.C. §§ 1959(a)(5), 1962(c) and (d), 922(g)(1), and 924(c)(1)(A)(iii), and 21 U.S.C. §§ 846 and 841(a)(1), following a jury trial that included hearsay evidence

_____

[*]Honorable John G. Koeltl, of the United States District Court for the Southern District of New York, sitting by designation.

admitted on the ground that the declarant was unavailable because his murder had been procured by the defendant.

Affirmed.

JEFFREY GOLDBERG, Assistant United States Attorney, Brooklyn, New York (Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, Peter A. Norling, Alyssa A. Qualls, Assistant United States Attorneys, Brooklyn, New York, on the brief), for Appellee.

EDWARD D. WILFORD, New York, New York 2(Anthony L. Ricco, Steven Z. Legon, New York, New York, on the brief), for Defendant-Appellant.

KEARSE, Circuit Judge:

Defendant Humphrey Stewart appeals from a judgment entered in the United States District Court for the Eastern District of New York on April 22, 2005, following a jury trial before Raymond J. Dearie, Judge (now Chief Judge), convicting Stewart of racketeering and racketeering conspiracy, in violation of 18 U.S.C. §§ 1962(c) and (d); conspiracy to distribute and possess with intent to distribute five or more kilograms of cocaine, in violation of 21 U.S.C. § 846; distribution and possession of five or more kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1); attempted murder and conspiracy to commit murder in aid of racketeering activity, in violation of 18 U.S.C. § 1959(a)(5); possession, as a convicted felon, of a firearm in violation of 18 U.S.C. § 922(g)(1); and

discharge of a firearm during a violent crime, in violation of 18 U.S.C. § 924(c)(1)(A)(iii). Stewart was sentenced principally to life imprisonment on each of the racketeering and narcotics counts and 10 years each on the attempted murder, conspiracy to murder, and § 922(g) firearm counts, with all of those prison terms to be served concurrently, and to a five-year term of imprisonment on the § 924(c) firearm count to be served consecutively to the other prison terms. All of these prison terms were to run consecutively to a state-court sentence Stewart was then serving. On appeal, Stewart contends, inter alia, that the district court violated his rights under the Confrontation Clause of the Sixth Amendment when it allowed certain trial witnesses to describe statements that had been made by a declarant whose murder the court found Stewart had procured. Finding no merit in this or any of Stewart's other contentions, we affirm the judgment.

## I. BACKGROUND

The present prosecution arose out of investigations into the narcotics trafficking activities in Brooklyn, New York, and elsewhere in the United States, of a group of men known as the "Patio Crew." The evidence at Stewart's 2004 trial included testimony from law enforcement officers, cooperating members of the Patio Crew (or "Crew"), and others.

Briefly summarized in the light most favorable to the government, the trial evidence included the following. Stewart and Emile Dixon were members of the Patio Crew, a gang that had controlled narcotics trafficking in the Flatbush section of Brooklyn for more than a decade. The Crew distributed powder cocaine and crack cocaine and was vigilant in protecting its Flatbush territory through the use of threats, assaults, robberies, and murder. Stewart and Dixon were regarded by other Crew members as particularly inclined towards violence. The Crew had a code of vengeance against anyone who cooperated with law enforcement authorities; in the vernacular of the Crew members, who were Jamaican nationals, the "rule" was "informer for dead," meaning that if an informer "cooperated with the police," the "[i]nformer must die." (Trial Transcript ("Tr.") at 110; see also id. at 312 ("[i]nformers must dead"); Stewart brief on appeal at 4 ("[T]he credo of the streets" included the rule "keep your mouth shut! Never become an informant! Never snitch! There was even a popular saying on the street, 'snitches for dead', which was a warning that meant death to informants.").)

In the summer of 1999, Stewart became aware that marijuana was being sold at one of the Crew's locations by Robert Thompson (a/k/a "Ragga"), who was not a member of the Crew. On July 29, 1999, complaining of Ragga's competition in front of Stewart's building (see Tr. 137), Stewart approached other Patio Crew members

and asked if anyone had a "fire stick," meaning a gun (Tr. 136, 341). Later that day, Ragga was shot several times. He was seriously injured, but recovered.

Ragga at first refused to reveal the identity of his assailant to the police (see, e.g., Tr. 727-28); he would say only that he had been in his jeep stopped at a red light when a man ran up, opened the door, and started firing a gun at him (see id. at 739-40). Eventually, however, Ragga informed the police that the shooter had been Stewart; Ragga so testified before a grand jury in March 2000. In the meantime, Ragga had told several others, including his girlfriend, his brother Steven, and the mother of two of his children, that he had been shot by Stewart.

Immediately after the shooting of Ragga, Stewart had fled Brooklyn for Buffalo, New York, where he continued to participate in the Crew's narcotics distributions. In January 2000, Stewart was arrested in Buffalo on New York State drug charges; he was eventually returned to Brooklyn to face outstanding charges with respect to an unrelated 1995 shooting in Brooklyn. As discussed in greater detail in Part II.A. below, Stewart, while being detained first in Buffalo and then in Brooklyn, sent several messages to Ragga urging him not to identify Stewart in a lineup and not to testify against him with respect to the 1999 shooting of Ragga. Ragga was undeterred, and in late March 2000 he informed a police detective that Stewart was the person who had shot him. Thereafter,

Stewart had several telephone conversations with Dixon, who urged Ragga not to testify against Stewart. Ragga refused to agree not to testify. On July 26, 2000, in a drive-by shooting, Ragga was killed by Dixon.

Dixon and Stewart were eventually indicted on federal charges, including several relating to the murder of Ragga. Stewart was charged with conspiring between July 1999 and July 2000 to murder Ragga and with attempting to murder Ragga on July 29, 1999, for the purpose of maintaining and increasing his position in the Patio Crew, a racketeering enterprise, in violation of 18 U.S.C. § 1959(a)(5). Because the government sought the death penalty against Dixon for the actual murder, the two defendants were tried separately. At Stewart's trial, the government was allowed to introduce evidence from a police detective and several other witnesses that Ragga had told them that the man who shot him on July 29, 1999, was Stewart. (See, e.g., Tr. 739-40, 991, 1098, 1309.) Stewart was convicted on the § 1959 counts, as well as the other counts described above.

## II. DISCUSSION

On appeal, Stewart contends, inter alia, that the admission of testimony that Ragga had identified him as the July 29, 1999 shooter violated his rights under the Confrontation Clause.

His other contentions include a challenge to the sufficiency of the evidence to support his conviction on one count and a contention that the district court failed to consider the appropriate factors in imposing sentence. Finding no merit in his contentions, we affirm the judgment.

A. The Confrontation Clause: Forfeiture of the Right

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Nonetheless, "'the law [will not] allow a person to take advantage of his own wrong,'" United States v. Mastrangelo, 693 F.2d 269, 272 (2d Cir. 1982) ("Mastrangelo") (quoting Diaz v. United States, 223 U.S. 442, 458 (1912) (other internal quotation marks omitted)) (brackets ours), and it is thus well established, as a matter of "[s]imple equity" and "common sense," that the right to confrontation is forfeited if the defendant has "wrongfully procured the witnesses' silence through threats, actual violence or murder," United States v. Dhinsa, 243 F.3d 635, 651 (2d Cir.) ("Dhinsa") (internal quotation marks omitted), cert. denied, 534 U.S. 897 (2001). See, e.g., id. at 652 ("'It is hard to imagine a form of misconduct more extreme than the murder of a potential witness. . . . We have no hesitation in finding, in league with all circuits to have considered the matter, that a defendant who

wrongfully procures the absence of a witness or potential witness may not assert confrontation rights as to that witness.'" (quoting United States v. White, 116 F.3d 903, 911 (D.C. Cir.), cert. denied, 522 U.S. 960 (1997))); United States v. Miller, 116 F.3d 641, 667-68 (2d Cir. 1997), cert. denied, 524 U.S. 905 (1998); United States v. Thai, 29 F.3d 785, 814 (2d Cir.), cert. denied, 513 U.S. 977 (1994); United States v. Aguiar, 975 F.2d 45, 47 (2d Cir. 1992); Mastrangelo, 693 F.2d at 272-73; United States v. Cherry, 217 F.3d 811, 814-15 (10th Cir. 2000); Steele v. Taylor, 684 F.2d 1193, 1201-02 (6th Cir. 1982), cert. denied, 460 U.S. 1053 (1983); United States v. Carlson, 547 F.2d 1346, 1358-60 (8th Cir. 1976), cert. denied, 431 U.S. 914 (1977). See also Crawford v. Washington, 541 U.S. 36, 62 (2004) ("the rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds").

In 1997, the Federal Rules of Evidence were amended to "recognize[] the need for a prophylactic rule to deal with [this type of] abhorrent behavior 'which strikes at the heart of the system of justice itself.'" Fed. R. Evid. 804 Advisory Committee Note (1997) (quoting Mastrangelo, 693 F.2d at 273). Under the heading "Forfeiture by wrongdoing," Rule 804(b)(6) provides that the hearsay rule does not require the exclusion of "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the

declarant as a witness." Fed. R. Evid. 804(b)(6) (emphasis added). Accordingly, the district court may admit hearsay evidence as to statements by an unavailable declarant if it finds by a preponderance of the evidence, see Fed. R. Evid. 804 Advisory Committee Note (1997); Fed. R. Evid. 104(a), that (a) the "party against whom the out-of-court statement is offered[] was involved in, or responsible for, procuring the unavailability of the declarant through knowledge, complicity, planning or in any other way," and (b) that party "acted with the intent of procuring the declarant's unavailability as an actual or potential witness," Dhinsa, 243 F.3d at 653-54 (internal quotation marks omitted).

In the present case, the district court found that the government had shown "by a preponderance of the evidence that Mr. Stewart acted through Mr. Dixon to secure the absence of the witness, Robert Thompson, and that [he did] so with intent to do just that." (Tr. 738.) Stewart challenges these findings. He points out that he "was in custody at the time the murder was committed," arguing that there was no "direct evidence that [he] commanded or directed that Mr. Dixon shoot the witness." (Stewart brief on appeal at 16.) And he argues that there was "no competent evidence, either direct or circumstantial, that [he] acted with the intent required under the second prong of Dhinsa." (Id.) Stewart's challenge is both legally flawed and contradicted by the record.

First, the government was not required to show Stewart's

involvement in Dixon's murder of Ragga by "direct evidence." Both the existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and criminal intent may be established through circumstantial evidence. See, e.g., United States v. Villegas, 899 F.2d 1324, 1338-39 (2d Cir.), cert. denied, 498 U.S. 991 (1990); United States v. Tutino, 883 F.2d 1125, 1129 (2d Cir. 1989), cert. denied, 493 U.S. 1081 (1990); United States v. Young, 745 F.2d 733, 762 (2d Cir. 1984), cert. denied, 470 U.S. 1084 (1985). Here the record contains ample circumstantial evidence of Stewart's involvement in Ragga's murder, principally in the form of telephone records and testimony from Stewart confidantes.

For example, Stewart's cousin Devon Tate testified that after Stewart was arrested in Buffalo, Stewart made a number of telephone calls to Tate from jail. Tate testified, "[Stewart] asked me to get in touch with Ragga's mother . . . to tell her to have [Ragga] not go to the identification line-up . . . ." (Tr. 433.) Tate passed that message to Ragga's brother Delroy and received a return call from Ragga's mother (id. at 433-34), who advised Tate not to be involved and said that Ragga would "go forward" (id. at 435). Tate testified that he relayed that response to Stewart; Stewart subsequently "told [Tate] that [Stewart] was ID-d by Ragga and he's an informer and informer must die." (Id.)

Susan Sanchez, a girlfriend of Stewart's, testified that while Stewart was in custody, first in Buffalo and then in Brooklyn,

- 10 -

she frequently, at Stewart's behest, arranged untraceable three-way calls between Stewart and others. (See Tr. 921-23.) She arranged such calls between Stewart and Dixon two or three times a week. (See Tr. 923.)

Patio Crew member Horace Burrell, one of the witnesses who described the Crew's rule that "[i]nformers must dead" (Tr. 312), testified that he witnessed a conversation between Dixon and Ragga's brother Delroy about Ragga after Stewart was arrested. In that conversation, Dixon said that Stewart had called him and instructed him to tell Delroy to tell Ragga that "he not supposed to go testify against him." (Tr. 342.) Burrell testified that when Delroy did not agree to relay that message to Ragga, "[Dixon] was upset and he was walking away and said tell your brother that if you don't listen to what we say shot will fire." (Tr. 343.)

The government also introduced Dixon's cellular telephone records and Stewart's prison telephone records. They showed telephone contacts between Dixon and Stewart in the weeks leading up to the murder and on the day of the murder itself.

Thus, before any witnesses were allowed to testify that Ragga told them he had been shot by Stewart, the court heard evidence that Stewart had instructed Dixon and others to try to persuade Ragga not to testify that Stewart was the person who shot him in July 1999, that the Patio Crew's code was that "[i]nformer must dead," and that both Stewart and Dixon had sent the message

- 11 -

that if Ragga insisted on testifying against Stewart, Ragga would be shot. Accordingly, the district court's ruling that the government had established by a preponderance of the evidence that Stewart acted through Dixon to murder Ragga, and did so with the intent to prevent Ragga from testifying against Stewart, was amply supported by the record.

Finally, we note that the forfeiture-by-wrongdoing principle made the testimony as to Ragga's statements admissible at Stewart's trial on the present federal charges even though Stewart's efforts had been focused on preventing Ragga from testifying at a different trial, to wit, Stewart's state trial for assault, rather than the trial in the present federal case (which had not yet been initiated). "The text of Rule 804(b)(6) requires only that the defendant intend to render the declarant unavailable 'as a witness.' The text does not require that the declarant would otherwise be a witness at any particular trial . . . . A defendant who wrongfully and intentionally renders a declarant unavailable as a witness in any proceeding forfeits the right to exclude, on hearsay grounds, the declarant's statements at that proceeding and any subsequent proceeding." United States v. Gray, 405 F.3d 227, 241, 242 (4th Cir.) (emphasis in original), cert. denied, 546 U.S. 912 (2005). Indeed, the forfeiture principle applies even to

> situations where "there was [no] ongoing proceeding in which the declarant was scheduled to testify." Miller, 116 F.3d at 668; see also [United States v.] Houlihan, 92 F.3d [1271, 1279-80 (1st Cir. 1996)].

> The application of <u>Mastrangelo</u> under these circumstances is both logical and fair since a contrary rule "would serve as a prod to the unscrupulous to accelerate the timetable and murder suspected snitches sooner rather than later." <u>Houlihan</u>, 92 F.3d at 1280.

<u>Dhinsa</u>, 243 F.3d at 652. A defendant will not be allowed to profit from such wrongdoing.

In sum, Stewart, by his involvement in the murder of Ragga, forfeited any right to exclude evidence of out-of-court statements by Ragga that he had previously been shot by Stewart.

B. <u>Other Contentions</u>

Stewart also contends that the evidence was insufficient to support his conviction for racketeering conspiracy, that the government failed to disclose exculpatory material, that the district court erred in failing to suppress evidence seized from his automobile, and that the court failed to consider the proper factors in imposing sentence. These contentions lack merit and do not warrant extended discussion.

Stewart contends that his conviction on the racketeering conspiracy count should be vacated on the ground that the evidence at trial was insufficient to establish that the Patio Crew was a racketeering enterprise, rather than simply a neighborhood social group. This contention is meritless. The evidence showed, <u>inter alia</u>, that members of the Patio Crew distributed narcotics and shared drug distribution opportunities; that the Crew maintained the

same core membership for some 12 years; that it regulated drug dealing within the territory it controlled; and that the members adhered to rules of conduct. This was ample to permit a rational juror to infer that the Patio Crew constituted a racketeering enterprise within the meaning of 18 U.S.C. § 1962. See, e.g., United States v. Dixon, 167 F. App'x 841, 843-44 (2d Cir. 2006) (holding that the similar evidence introduced at Dixon's trial was sufficient to show that the Patio Crew was a racketeering enterprise).

Stewart also contends that the government violated its duty under Brady v. Maryland, 373 U.S. 83 (1963), and Kyles v. Whitley, 514 U.S. 419 (1995), to turn over evidence that could have been used to impeach the credibility of one of its witnesses, Jimael Allen. Stewart claims that Allen testified that Dixon killed Allen's associate Omar Sutherland, and that the government knew and failed to disclose that someone else had been convicted of that murder. Even assuming that such a conviction could have been considered material evidence with respect to the charges against Stewart, Stewart's factual premises are unsubstantiated. First, Stewart has pointed to no evidence as to another person's conviction for the murder of Sutherland. Second, Stewart has provided no record citation to support his assertion that Allen testified that Sutherland was murdered by Dixon. We have found no such accusation by Allen, who testified as follows:

- 14 -

Q. Did there come a time when Omar was killed?

A. Yes.

Q. Did you witness the murder?

A. No, I didn't.  I wasn't there that night.

(Tr. 1143.)

Stewart's contention that the district court erred in failing to suppress $20,000 in cash that had been found, following his arrest after a routine traffic stop in 1996, in a car Stewart was driving, borders on the frivolous.  Stewart waived this argument when he conceded before the district court that the evidence was admissible under the inevitable discovery doctrine (see Tr. 1209). In any event, one of the arresting officers testified, without contradiction, that he and other police officers regularly performed inventory searches of such a vehicle at the scene of a driver's arrest to determine whether the vehicle could safely be left on the street.  (See Tr. 1030.)  Thus, even without Stewart's concession, the evidence would have been admissible as the fruit of a valid inventory search.  See, e.g., United States v. Thompson, 29 F.3d 62, 65 (2d Cir. 1994) (postarrest inventory search conducted pursuant to routine standardized practice does not violate Fourth Amendment).

Finally, we reject Stewart's claim that the district court, in imposing his sentence, erred by failing to consider the sentencing factors enumerated at 18 U.S.C. § 3553(a).  "[W]e presume, in the absence of record evidence suggesting otherwise,

that a sentencing judge has faithfully discharged her duty to consider the statutory factors." United States v. Fernandez, 443 F.3d 19, 30 (2d Cir.), cert. denied, 127 S. Ct. 192 (2006). We see nothing in the record to suggest that the district court here failed to discharge this duty. Rather, the district court carefully considered whether the Guidelines sentence it imposed would be appropriate, and we see no basis for finding the sentence unreasonable, see United States v. Booker, 543 U.S. 220, 260-61 (2005).

CONCLUSION

We have considered all of Stewart's arguments on this appeal and have found them to be without merit. The judgment of the district court is affirmed.