# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| **STATE OF DELAWARE** | ) | |
| | ) | |
| **v.** | ) | **ID No. 1611008842** |
| | ) | |
| **KEVIN D. MILLER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

Submitted: February 26, 2020
Decided: July 30, 2020

*Upon Defendant's Motion for a New Trial–*
**DENIED**.

## OPINION

Beth Savitz, Esquire, Deputy Attorney General and Joseph S. Grubb, Esquire, Deputy Attorney General, Attorneys for the State.
Anthony A. Figliola, Jr., Esquire; Attorney for Defendant.

**STREETT, J.**

This 30th day of July, 2020, upon consideration of Defendant's Amended Motion For a New Trial, the State's Response, additional submissions, and the record of this case, Defendant's Motion is **DENIED**.

It appears that:

Kevin D. Miller (the "Defendant"), through his attorney, has filed a motion for a new trial. Defendant was convicted, after a jury trial, of Murder First Degree and Possession of a Deadly Weapon During the Commission of a Felony (PDWDCF). Thereafter, he was convicted of Possession of a Deadly Weapon By a Person Prohibited (PDWBPP) after a bench trial.

Defendant asserts that he was deprived of his right to confrontation when the Court admitted the videotaped statement of an absent witness (based on the hearsay exception of forfeiture by wrongdoing). Defendant alleges that the State could not prove witness intimidation attributable to Defendant as a predicate to that exception; that the use of that videotape bolstered the State's indicted charge of witness tampering (even though the tampering charge was dismissed upon Defendant's motion for a judgment of acquittal); and that the dismissal of the tampering charge supports Defendant's contention that the proof of intimidation was weak.

This murder case involved an incident in July 2012 where two eyewitnesses, who knew the Defendant, separately observed the Defendant walk with a mask and a gun through their housing development (Sparrow Run, formerly known as

Brookmont Farms), when the streets were empty and sneak up on Jeremiah McDonald ("McDonald" or the "victim") as McDonald talked with two women by a vehicle. Defendant aimed directly at McDonald, shot him repeatedly at close range, unjammed the gun after it had jammed, and shot McDonald again after McDonald fell to the ground. He then rapidly disappeared through an alley that connected to the Wellington Woods development.

On November 21, 2016, Defendant was indicted on the charges of Murder First Degree, Possession of a Firearm During the Commission of a Felony, and Possession of a Deadly Weapon By a Person Prohibited.

On April 23, 2018, Defendant was re-indicted on the charges of Murder First Degree, Possession of a Firearm During the Commission of a Felony, Possession of a Deadly Weapon by a Person Prohibited and Tampering by Deceit with a Witness (Warner Wheeler). A fifth count in the indictment charged a co-defendant, Shelly Brown, with Tampering by Deceit with the same witness.[1]

Trial began on October 21, 2019 and the jury returned its verdict on October 30, 2019.[2]

---

[1] Ms. Brown's charge was *nolle prossed* during the trial.

[2] The Tampering by Deceit charge was dismissed upon a Motion for Judgment of Acquittal.

On November 5, 2019, Defendant, through counsel, filed a Motion for a New Trial.  On November 19, 2019, the State filed its response.

On November 22, 2019, the Court ordered Defendant to resubmit his Motion for a New Trial with citations to the transcript.  On February 26, 2020, Defendant filed the instant Amended Motion for a New Trial. On April 17, 2020, the State filed its Response.[3]

The facts of the case are that there was "bad blood" between Defendant and the victim;[4] Krystle Bivings (the mother of the victim's child) had recently begun an intimate relationship with Defendant;[5] and Defendant and the victim engaged in a verbal argument a few days before the murder. This argument was witnessed by many people from the development and Warner Wheeler had to restrain Defendant, who was his buddy, to prevent the confrontation from becoming violent.  Sparrow Run is a development where many people congregate outside and there is drug activity.

On the night of the murder, Defendant and Michael Mude were together away from Sparrow Run. Defendant told Mude that he felt disrespected by McDonald and

---

[3] Defendant filed a Reply on May 13, 2020; the State filed a Sur-Reply on May 27, 2020; and the Defendant filed a Reply to the Sur-Rebuttal on June 3, 2020.

[4] Tr.T. Oct. 22, 2019 at 86.

[5] Tr.T. Oct. 22, 2019 at 81.

was going to make an example of him.[6]  Defendant and Mude parted company around 10 p.m. and each man separately drove in the direction of Sparrow Run. Mude noticed that Defendant drove into the Wellington Woods development (that connected, through an alley, to Sparrow Run).[7]

Around that same time, Wheeler and James Watson (who also knew Defendant) were standing outside of separate residences near a cul-de-sac in Sparrow Run. The streetlights were on and the cul-de-sac was empty (except for McDonald who was talking to two women) because neighborhood residents would disperse nightly between 10:30 p.m. and 11:30 p.m. in anticipation of probation curfew checks known to randomly occur at that time.[8] The crowd would then reassemble around 11:30 p.m. and resume their activities in the street and at a local "trap house".[9]  Wheeler and Watson each observed Defendant, with a mask and a gun, walk by houses during this quiet time. They then watched Defendant approach and fatally shoot McDonald as McDonald talked with the two women (Marquita Brooks and Shantell Newman) who were near a vehicle.

---

[6] Tr. T. Oct.  24, 2019 at 97.

[7] Tr. T. Oct. 24, 2019 at 98.

[8] Tr. T. Oct. 28, 2019 at 105–07, 114, 134–36.

[9] Although not defined at trial, a trap house is a house where there is drug activity.

Wheeler immediately called 911,[10] the police responded, and it was clear that McDonald had died.[11] Wheeler would not identify Defendant (and later gave exculpatory statements to protect Defendant). Watson was not initially interviewed. The women were not from the Sparrow Run neighborhood, did not know Defendant, and could not identify the shooter because he wore an animal mask.[12] The women also said that the shooter rapidly got away through an alley. A police dog tracked the shooter through the alley but then lost the scent in the Wellington Woods development.[13] A forensics investigation did not lead to the identification of the killer and the case was considered a cold case until another detective became involved in 2016.

At some point, Mude, who lived in Sparrow Run, was interviewed by the police. Mude told the investigators that the Defendant came to his house, uninvited, on the morning after the shooting, made a quasi-admission to the shooting, and declared that eyewitnesses to the murder know better than to identify him. A few days later, Defendant attended McDonald's funeral and told Mude that he was at the

---

[10] The jury heard the recorded 911 call, Wheeler testified that it was his voice on the tape, and the jury had the opportunity to compare the voices. Tr. T. Oct. 28, 2019 at 45.

[11] The Medical Examiner determined that the cause of death was homicide.

[12] Tr. T. Oct. 22, 2019 at 23, 55. They also said that he wore a winter jacket.

[13] Tr. T. Oct. 21, 2019 at 57.

funeral for "appearances".[14]  On another occasion, Defendant encountered Mude at Walmart and Mude felt threatened when Defendant commented, "You starting to worry me...I know where your mom live…"[15]

Warner Wheeler, after providing conflicting stories to the police, eventually identified Defendant as the gunman. Wheeler testified that some of his prior statements to the police were lies and he had agreed with Defendant to lie in order to protect the Defendant.  He said that his prior lies were not the product of deceit and he did not feel deceived by Defendant.  He explained that he eventually decided to tell the truth to investigators (that he saw Defendant put on a mask and shoot the victim) because he and his family had been threatened as the trial neared.  He insisted that he was telling the truth at trial.[16]

At trial, James Watson testified that he did not clearly remember the night of the murder.  In Watson's presence, the State called Detective Brian Shahan to read a transcript from an interview he conducted with Watson on April 21, 2016.  During the interview, Watson stated that, just before the murder, he saw Defendant in Sparrow Run with a gun and wearing a wolf mask. Defendant pointed the gun at him

---

[14] Tr. T. Oct. 24, 2019 at 103.

[15] Tr. T. Oct. 24, 2019 at 103.

[16] Tr. T. Oct. 28, 2019 at 43.

and he reacted by telling Defendant to "stop playing".[17]  Watson then said to himself, "Oh shit, he ain't playing" and continued to observe Defendant.[18]  He stated that he was sure that Defendant shot McDonald although he had initially told the police multiple stories.[19]

Mude testified that he had initially withheld information from investigators because he was scared, was facing jail time, and had hoped to use his information to bargain for leniency but the State would not bargain with him.  Mude testified that Defendant came to his home in Sparrow Run on the day after the shooting and said, "Mother fuckers that seen me do it know better than to say my name, and the people that know I did it ain't going to say shit".[20]

Mude also said that he had been labelled a snitch in the past and, on another occasion, Defendant noticed Mude's RIP (rest in peace) tattoo of McDonald, and told him, "You starting to worry me…I don't need to tell you, I know where your mom live…Listen, mother fucker, you can end up just like your boy Farmer [McDonald]".[21]  Mude testified that he had been shot in the past, was afraid, and did

---

[17] Tr. T. Oct. 22, 2019 at 148.

[18] Tr. T. Oct. 22, 2019 at 141.

[19] Tr. T. Oct. 22, 2019 at 141, 156-157.

[20] Tr. T. Oct. 24, 2019 at 101.

[21] Tr. T. Oct. 24, 2019 at 103-104.  McDonald's nickname was "Farmer".

8

not want to "end up dead".[22]  Mude admitted that he was previously a white supremacist but said that was in the past.[23]

Charles Coleman, who visited Sparrow Run every day, testified that he was not present during the shooting but someone else typed up an exculpatory affidavit using his name.[24]

There also was significant testimony about Defendant's and others' efforts to persuade people to derail prosecution of this case. Defendant had warned Mude that snitching could have fatal consequences, avoided detection of his numerous prison phone calls (by using the SBI numbers of several other inmates), orchestrated the creation of alibis,[25] created forged exculpatory affidavits,[26] and enlisted associates to help him.  Defendant's sister testified that she received instructions from Defendant to try to persuade people to be alibi witnesses. Defendant had also

---

[22] Tr. T. Oct. 24, 2019 at 127.

[23] Although Defendant is African-American and the victim was white, race was not an issue in this trial.

[24] Tr. T. Oct. 23, 2019 at 155.

[25] Tr. T. Oct. 22, 2019 at 93; Oct. 29, 2019 at 119. Krystle Bivings testified that Defendant came to her residence in Sparrow Run between 7–8 a.m. on the morning after the shooting, Defendant said that he had been at home in Newark during the shooting, and they tried to "piece things together"; Rose Miller testified that Defendant talked to her on his landline telephone in a development in Newark (near Maryland) shortly after the shooting.

[26] Tr. T. Oct. 23, 2019 at 58. Some of the bogus alibi affidavits involved Charles Coleman, Dashonne Jones, Thomas Christy, Adrian Tyler, and James Watson.

directed others to provide the police with a mask and coat that had been in the trap house (and would have been contaminated with a mix of genetic materials). Those items were given to the police and a forensic examination was inconclusive.

Moreover, an unusually large number of spectators were present in the courtroom throughout the trial.[27] Some of the witnesses (and the State) identified them as associates of Defendant. At times, the spectators glared at the witnesses during their testimony and several spectators would exit the courtroom after each witness testified and then reenter the courtroom when another witness would begin to testify.

At one point, a witness at first refused to testify if the onlookers were present. On another occasion, pursuant to *Guardarrama v. State*, the Court asked several spectators to leave the courtroom because of their menacing behavior.[28] As they were exiting, one of the spectators mumbled something at the prosecutor, which was

---

[27] Tr. T. Oct. 22, 2019 at 10. On the second day of trial, a juror said that she lived near Sparrow Run and she felt uncomfortable because some of the spectators were staring at her in the parking lot when she left the courtroom on the previous day. Although the juror said that she believed that she could be fair, the Court excused the juror over the objection of the defense.

[28] *Guardarrama v. State*, 2006 WL 2950494 (Del. Oct. 17, 2006) (affirming the trial court's decision to exclude a spectator because the State advanced an overriding interest in excluding a spectator who would have made a witness fearful to testify. The State had established that the witness felt threatened, the court had considered alternatives to closing the courtroom, and the courtroom was partially and temporarily closed to the threatening spectator). *See* footnote 37, *Infra.*

10

believed to be a threat, and fled the courthouse when a bailiff attempted to return him to the courtroom.

The State argued, from the beginning of the trial, that there was witness intimidation. The State referenced the above examples and informed the Court about threatening communications to witnesses before trial, during the proceedings, and after witness testimony. The State also said that several spectators at trial were Defendant's associates and, having watched the State's opening statement where the State announced the names of witnesses and published their photographs, they used this information to frighten potential witnesses. The State told the Court that Wheeler, Watson, Mude, and Tony Pruitt were afraid. The State additionally said that Watson had appeared in the courthouse but ran out when threats were made.[29] Additionally, Krystle Bivings, who had dated Defendant, testified that she was afraid and had moved to Milwaukee.[30]

The State also obtained material witness warrants from another judge to bring Wheeler and Pruitt to court. Wheeler was found, incarcerated, and wore prison clothing when he testified. Wheeler, Watson, and Mude each testified that they felt intimated. Wheeler also informed the Court that some of the spectators were Defendant's associates. On October 28, 2019 based on the preponderance of the

---

[29] Tr. T. Oct. 22, 2019 at 71.

[30] Tr. T. Oct. 22, 2019 at 93.

evidence and the Court's observations over several days, the Court found that there was a sufficient predicate to find witness intimidation attributable to Defendant.

Tony Pruitt, however, failed to appear despite warnings, two subpoenas, and a protracted search following the material witness warrant. The State informed the Court that Pruitt could not be found.[31] The State argued that Pruitt was absent due to intimidation attributable to Defendant and that Pruitt's prior out-of-court statement to the police should be allowed under the hearsay exception of forfeiture by wrongdoing.[32] The defense, without any proof, insisted that the Defendant was not involved in any recent intimidation because he was in jail. The Court admitted Pruitt's prior out-of-court statement as an exception to the hearsay rule over the objection of the defense. Pruitt's statement corroborated the heated argument and animosity between Defendant and McDonald. Additionally, Pruitt said that Defendant told him to, "Tell him [McDonald] Halloween is coming early".[33]

---

[31] Tr. T. Oct. 28, 2019 at 3–8. The Police contacted Pruitt's family and his girlfriend (who said that Pruitt had texted her that five unknown people showed up at his place of employment on the first day of trial, said that they saw his photo on a screen at trial, and threatened him. She also informed them that Pruitt also said that he was going to disappear and he then quit his job). The police flagged Pruitt's vehicle and looked for him at Delaware Park (because recent social media posts indicated that he would go there during the NFL season). The police could not find Pruitt.

[32] Delaware Rule of Evidence 804(b)(6) allows the use of an out-of-court statement if it is a "statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to and did procure the unavailability of the declarant as a witness".

[33] Tr. T. Oct. 28, 2019 at 186.

Defendant's witnesses were Dashonne Jones, Investigator William Browne (who was a former Wilmington Police officer), Gregory Johnson, and Rose Miller (Defendant's wife). Defendant did not testify. Ms. Jones is the mother of Defendant's child. She acknowledged that Defendant had used the identification numbers of other inmates to make telephone calls.[34] William Browne testified that Wheeler and Watson would have been approximately 150–217 feet away from the shooting. Gregory Johnson testified that he and the Defendant had been together in the Greentree residential rehabilitation program; he also said that he and Wheeler had been together in prison, at a different time, and Wheeler told him that he was at the murder scene after the shooting.[35] Ms. Miller testified that she talked with Defendant on his Newark landline telephone around the time of the murder.[36]

### The Parties' Contentions

On February 26, 2020, Defendant filed the instant Amended Motion for a New Trial. In addition to challenging the sufficiency of the State's case without Pruitt's statement (which Defendant alleges was impermissible hearsay because the defense felt that proof of intimidation attributable to Defendant was dubious, particularly since the tampering charge was dismissed), Defendant alleges that the State

---

[34] Tr. T. Oct. 29, 2019 at 61.

[35] Tr. T. Oct. 29, 2019 at 115.

[36] Tr. T. Oct. 29, 2019 at 119.

13

improperly suggested throughout the trial that Defendant attempted to influence witnesses. Defendant contends that, in the State's attempt to prove its indicted charge of witness tampering, the State told the jury that the Defendant attempted to influence witnesses; that the Court improperly denied Defendant's motion for a mistrial when the Court granted the State's request to clear the courtroom during James Watson's testimony[37]; the requested material witness orders for Pruitt and Wheeler were improper; and that the State improperly introduced an alibi affidavit

---

[37] On October 22, 2019, the Court denied the State's motion to close the courtroom. Tr.T. 113-121. On October 28, 2019, upon motion by the State, the Court excluded four individuals from the courtroom (out of the presence of the jury) during Wheeler's testimony. Tr. T. Oct. 28, 2019 at 85–93. In so doing, this Court considered the four-prong test in *Guardarrama v. State*, 2006 WL 2950494, at *4–5 (Del. Oct. 17, 2006) (" (a) the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced; (b) the closure must be no broader than necessary to protect that interest; (c) the trial court must consider reasonable alternatives to closing the proceeding; and (d) the trial court must make findings adequate to support the closure."). The Court found that the State had shown an overriding interest to prevent witness intimidation. The Court excluded only certain individuals from the courtroom and allowed the rest of the audience to remain, including Defendant's mother and sister. The Court considered whether there were alternatives to excluding the individuals, the parties did not suggest alternatives, and the Court was satisfied that there were no alternatives. In excluding the individuals, the Court found that the witness had received threats, that the witness expressed fear, and that the individuals were making faces and threatening expressions at the witness while he was testifying. Tr. T. Oct. 28, 2019 at 88–90.

Later upon motion by the State, and also during Wheeler's testimony, the Court excluded (outside the presence of the jury) another individual from the courtroom who arrived after the other four individuals had been excluded. The State recognized the individual, whom it identified by name. The State contended that the individual was present during the testimony of a prior witness (Watson) who had been receiving threats since his testimony (Watson's girlfriend had also been receiving threats). The defense counsel did not object and stated that the threats were not coming from his client but that he "can't control what other people are doing." Tr. T. Oct. 28, 2019 at 121–22.

14

signed by Watson that was supposedly the product of Defendant's actions and his coordination with associates.[38]

Defendant also posits that the statements of Wheeler and Watson were too distant in time from the date of the shooting to be of value; they lacked credibility because the lighting at the scene was dim; and that various documents were improperly allowed (including an alibi affidavit which Watson denied, prison records reflecting that Defendant had repeatedly used the SBI numbers of other inmates to make outgoing prison calls, and letters from the Defendant to his sister asking her to take alibi affidavits that had been dictated or sent by Defendant to friends for their signature).

As to Tony Pruitt's 804(b)(6) statement, the Defendant argues that it was inherently unreliable because the interview occurred several years after the shooting; Pruitt was the victim's cousin; and the statement contained hearsay within hearsay (although the Defendant acknowledges that the Court gave a curative instruction). The Defendant also contends that there was insufficient evidence of Pruitt's unavailability because the probation officer did not testify and the State did not conclusively show that threatening text messages were sent by Defendant or at Defendant's direction.

---

[38] In view of the fact that Watson testified at trial, he was available for cross-examination as to the affidavit.

On April 14, 2020, the State responded to Defendant's contentions. The State submits that there was sufficient evidence to convict Defendant without Pruitt's statement because the State had four eyewitnesses who testified to the crime and Pruitt's statement was not essential for a jury to find that Defendant had shot and killed his victim. The State also explained (as it did at trial out of the presence of the jury) that witnesses were fearful of Defendant and his associates, and that Pruitt, in particular, had been cooperative with police and probation[39] but abruptly changed his version of events two weeks before the start of trial because he was afraid.[40]

---

[39] The State, in its response, attached an affidavit Pruitt's officer that was created after the trial to memorialize the State's proffer at trial. The memorialization of the State's proffer is redundant. Moreover, the Court declines to consider the affidavit because it was submitted after the close of evidence. *See ATR-Kim Eng Financial Corp. v. Araneta*, 2006 WL 3783520, at *9, n. 50 (Del. Ch. Dec. 21, 2006) (The Court declined to consider a post-trial affidavit because "it was submitted after the close of evidence…"); *State v. Ruiz*, 2002 WL 1265533, at *4 (Del. Super. June 4, 2002) ("In deciding on the motion [for a new trial], the trial judge may utilize the knowledge he gained from presiding at trial as well as the showing made on the motion."); *State v. Bailey*, 2020 WL 1316838, at *2 (Del. Super. Mar. 16, 2020) (The Court based its decision to deny the motion for a new trial on "the record of [the] case."); *State v. McCrea*, 1999 WL 1427772, at *3 (Del. Super. Oct. 29, 1999) (In reviewing a motion for a new trial, the Court based its decision on "the record of [the] case."); *State v. Washington*, 2001 WL 1480870, at *1 (Del. Super. Apr. 10, 2001) (The Court denied the motion for a new trial upon consideration of the motion, the State's Response, and "the record of [the] case."). *See also Pope Investments LLC v. Benda Pharmaceuticals, Inc.*, 2010 WL 3075296, at (Del. Ch. July 26, 2010) ("[T]he admission of late-submitted evidence is not favored.").

[40] Pruitt had previously told the police about the confrontation between Defendant and the victim; Pruitt also said that Defendant told him to tell the victim that Halloween is coming early and [the victim] better watch out. As trial neared, Pruitt changed his story, said that he had lied, could not remember his statement to the police, and said that he did not wish to testify. He was told that he needed to appear in court.

Pruitt then asked for the contact information for Defendant's attorney so that he could notify the defense that he could not remember events. He was given the telephone number and

## Discussion

The law is clear that a Court may grant a new trial if it is required in the interest of justice. Examples of "in the interest of justice" include a juror not notifying the court that he is disqualified by law to serve on a jury; the jury being exposed to court-created trial notes that were inadvertently left in the jury room and that revealed prejudicial information; the court being reasonably satisfied that the trial testimony of a material witness was false; the court admitting inadmissible hearsay relating to a crucial element in the case that caused prejudice to the defendant; the prosecutor making prejudicial statements relating to the defendant's decision not to testify; and several errors being made during the course of a trial that substantially affect the defendant's rights.[41]

---

contacted Defendant's attorney, reiterated to the attorney that he could not remember anything, and the defense attorney told Pruitt that he had to honor the subpoena.

According to the State (and Pruitt's probation officer), Pruitt went to his regularly scheduled probation appointment, which was also on the first day of trial, and he was served with a subpoena to appear at trial the next day. Pruitt told the probation officer that he feared for his family's safety.

A judge, other than the trial judge, then issued a material witness order for his appearance. Police and probation attempted to locate him but they were unsuccessful. Pruitt's girlfriend showed the police a text from Pruitt which indicated that he had been threatened and that five unknown people had come to his place of employment on the first day of the trial, said that they saw his picture on a screen, and threatened him. Pruitt's text also informed his girlfriend that he was going to "disappear". Pruitt immediately quit his job and had someone collect his paycheck. Despite a diligent search, investigators were unable to find Pruitt.

[41] *State v. Jackson*, 2003 WL 21538044, at *1 (Del. Super. June 27, 2003) (granting a new trial because a juror member deliberately did not disclose that he was a convicted felon who did not have his civil rights restored to serve on a jury); *State v. Shaia*, 2000 WL 303338, at *10 (Del. Super. Feb. 10, 2000) (granting a new trial because the court clerk's trial notes, which made

However, the law is also clear that a new trial will not be granted if "there is some probative evidence upon which a verdict of guilty could reasonably be based."[42] Having carefully reviewed the record and the parties' submissions, the Court is satisfied that the State presented probative evidence of Defendant's guilt. As such, Defendant's Motion for a New Trial is Denied.

Defendant contends that there was insufficient evidence presented to the jury for a conviction without the videotaped statement of Tony Pruitt. That contention is contradicted by the record. The State presented probative evidence of identity, motive, opportunity, and means.

Two eyewitnesses who knew Defendant identified him as the shooter. As to motive, the State presented evidence of anger, resentment, jealousy, and that Defendant was physically smaller than McDonald. The evidence showed that

references to motions and excluded evidence, were left in the jury room and members of the jury stated that they had seen the notes); *State v. Black*, 1996 WL 33323917, at *2 (Del. Super. Oct. 2, 1996) ("a new trial should be granted when the Court is reasonably well satisfied that the trial testimony given by a material witness is false."); *State v. Rivera*, 525 A.2d 182, 187 (Del. Super. July 3, 1986) ("Because the [inadmissible] toxicology report related to a crucial element in the State's case, its admission was prejudicial to the defendants. The defendants are, accordingly, in the interest of justice, entitled to a new trial."); *State v. Reed*, 1992 WL 179234, at *4-5 (Del. Super. June 26, 1992) (holding that the prosecutor's comments concerning the defendant's decision not to testify impacted on the defendant's right to not testify); *State v. Savage*, 2002 WL 187510, at *1 (Del. Super. Jan. 25, 2002) (granting a new trial because the State's witness, who was a police officer, gave her personal opinion regarding the veracity of a particular witness; the prosecutor made several improper statements during closing arguments; and the defendant's prior bad acts were improperly introduced).

[42] *State v. Waters*, 2019 WL 2486753, at *2 (Del. Super. June 13, 2019).

Defendant and McDonald were both habitues of Sparrow Run and knew each other. There was testimony that Defendant was shorter than McDonald and that McDonald was known as a "wild man"[43] who had badly beaten someone. Several witnesses testified that Defendant had started dating McDonald's baby's mother; the Defendant and the victim had a public argument a few days before the murder; and that Defendant had to be physically restrained. The Defendant later said that he felt "disrespected" by McDonald and that he intended to "make an example of [McDonald]."[44]

The evidence also showed that the Defendant had the opportunity to commit the crime. The Defendant was seen driving into the connecting development shortly before the murder and was recognized by two men as he walked through Sparrow Run. Defendant was the only other person walking around during the strategic time when there would be the fewest witnesses (while the usual crowd was pretending to abide by probation curfews). Those two eyewitnesses each watched the Defendant carry a mask and a gun. They each said that Defendant then shot McDonald (who, with the two women, were the only people in the cul-de-sac).

---

[43] Tr. T. Oct.23, 2019 at 187.

[44] Tr. T. Oct. 24, 2019 at 97, 122, 137.

Additionally, one of those eyewitnesses called 911 immediately after the shooting to request an ambulance (although he did not volunteer the name of the shooter).

Furthermore, the two women, who were next to the victim when the masked shooter appeared and shot several times, watched the shooter as he slipped out of Sparrow Run through an alley connected to the Wellington Woods development (where he had been seen entering shortly before the murder). There was additional evidence presented that a police dog tracked the scent of the shooter into the alley that connected to Wellington Woods and then lost the scent.

Moreover, there was evidence of means. Wheeler and Watson saw Defendant holding a gun and saw him shoot McDonald. The two women also watched the gunman kill McDonald.

The State also presented evidence of consciousness of guilt. There was testimony that the Defendant was in Sparrow Run the morning after the shooting to "piece things together" and discuss an alibi with the mother of the victim's child. Shortly thereafter he appeared, uninvited, at Mude's residence in that development and essentially admitted the shooting, issued a warning about snitching, and again attempted to establish an alibi. Defendant thereafter encountered Mude at the victim's funeral and reminded Mude of the alibi. On another occasion, Defendant confronted Mude at Walmart and threatened him.

20

The State also presented evidence that Defendant, upon arrest and imprisonment, created documents containing false alibis and pressured others to sign them. So too, there was evidence that Defendant used the SBI numbers of other inmates to make telephone calls from prison. Additionally, Defendant's sister testified that Defendant requested that she visit their friends to persuade them to sign affidavits (drafted by Defendant) falsely attesting to alibis for Defendant.

Moreover, the defense cross examined the State's witnesses, presented witnesses, and gave a closing argument. Defense counsel posited that the lighting in the cul-de-sac was dim and that the State's witnesses were unreliable because they did not give their statements to the police immediately after the shooting, had motives to lie, and their statements had changed. Although the defense challenged the prosecution's evidence, "[a] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt".[45] Ultimately, there was sufficient probative evidence in the record (without Pruitt's statement) for the jury to reasonably find that the Defendant killed McDonald.

Furthermore, although Pruitt's out-of-court statement was hearsay, the State had shown by a preponderance of the evidence that this hearsay was an exception to

---

[45] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) cited in *U.S. v. Baskerville*, 448 Fed. Appx. 243 (3d Cir. 2011).

the hearsay rule pursuant to Delaware Rule of Evidence 804(b)(6).[46] Pruitt's absence from trial was the product of intimidation attributable to the Defendant, directly or by acquiescence.[47] The State brought the issue of intimidation to the Court's attention every day from the beginning of the trial. The Court did not rush to a decision on this issue and was, at first, unwilling to find intimidation attributable to Defendant. However, after several days of testimony, observations of Defendant's associates in the courtroom, and representations that several potential witnesses had felt intimidated by Defendant and his intermediaries,[48] the Court found that the State's proffer and cumulative circumstances established witness intimidation and that Pruitt's absence was the result of that intimidation. Having determined that there was a sufficient basis to find intimidation and that Pruitt had been intimidated,

---

[46] D.R.E. 804(b)(6) allows the use of an out-of-court statement if it is a "statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to and did procure the unavailability of the declarant as a witness".

[47] *See State v. Phillips*, 154 A.3d 1130, 1143 (Del. 2017). *See also U.S. v. Stewart*, 485 F. 3d 666, 670 (2nd Cir. 2007) which stated that forfeiture was a "matter of simple equity and common sense" when a defendant wrongfully procures a witness' silence.

[48] *See Giles v. California*, 128 S. Ct. 2678, 2683 (2008).

22

the Court allowed the use of Pruitt's statement[49] but gave the defense the opportunity to research the application of forfeiture by wrongdoing as it related to this trial.[50]

For the reasons previously set forth in detail, Pruitt's statement was admissible under the hearsay exception of forfeiture (of the right to confrontation) by wrongdoing. A hearsay exception need only be shown by the preponderance of the evidence[51] and the defense presented no evidence to the contrary. Here, although the Court did not specifically catalog all of the reasons why the statement was admissible, the evidence provided was material, had a proper purpose, was plain, clear and conclusive, was not too remote in time, and was not outweighed by the danger of unfair prejudice or confusion.[52] Additionally, a hearing (or mini-trial) is not required prior to the court's determination of a hearsay exception and the defense did not request a hearing.[53]

---

[49] Tr. T. Oct. 28, 2019 at 3–28. The Court stated, "I believe the State is saying…forfeiture by wrongdoing doesn't have to be only in relation to Wheeler, it is in relation to anybody who may have felt intimidated or changed their story…and the wrongdoing is wrongdoing which would carry over to anybody who has been affected by it or may be affected by it." *See also U.S. v. Mastroangelo*, 693 F.2d 269, 270 (2nd Cir. 1982) where the court noted that it was "inconceivable" that the intimidation would have been without the defendant' knowledge.

[50] The defense did not provide any cases.

[51] *See Anderson v. State*, 2018 WL 6068736 at *1 (Del. Nov. 20, 2018) where the Court held that the preponderance of the evidence can be reached if there is a thorough balancing test between Delaware Rule of Evidence 404(b) and the danger of unfair prejudice.

[52] The jury was not informed of the reason for Pruitt's absence.

[53] *U.S. v. Baskerville*, 448 Fed. Appx. 243 (3rd Cir. 2011) where the Court held that a mini-trial is not necessary when the prosecution makes a sufficient proffer.

23

Furthermore, the State explained, and the Court is satisfied, that law enforcement made sufficient efforts over several days to find Pruitt. That is distinguishable from the *McCandless* case[54] cited by the defense. In *McCandless*, investigators made little effort to find the witness. Additionally, *Johnson v. State*, where the witness appeared but claimed an inability to remember,[55] is also inapposite.

Thus, while every defendant has the right to confront witnesses, the law is clear that a defendant's wrongdoing can "extinguish confrontation claims".[56]

So too, Defendant's contention equating tampering by deceit and intimidation (that the dismissal of the tampering with a witness by deceit charge indicates the weakness of the predicate for the hearsay exception of forfeiture) is a false equivalency and lacks merit. The tampering charge involved deceit and did not allege intimidation; whereas the intimidation set forth involved threats and did not involve deceit (and the elements of proof differ[57]). The object of the indicted

---

Moreover, in the instant case, although the defense said that the State may have to bring in Pruitt's employer, it did not request a hearing as to law enforcement efforts. Tr. T. Oct. 28, 2019 at 21.

[54] *McCandless v. Pennsylvania*, 172 F.3d 255 (3rd Cir. 1999).

[55] *Johnson v. State*, 878 A. 2d 422 (Del. 2005).

[56] *Crawford v. Washington*, 541 U. S. 36, 62 (2004).

[57] The tampering by deceit charge was dismissed upon a motion for judgment of acquittal because Warner Wheeler testified that he had not been deceived. In contrast, several witnesses testified that they were threatened and afraid to assist the prosecution. Pursuant to 11 *Del. C.* 3532,

tampering by deceit charge was Wheeler; whereas the intimidation was widespread and impacted several people (Wheeler, Watson, Mude, Pruitt, and family members felt directly or indirectly threatened by Defendant and his associates; and they feared retaliation if they cooperated in the prosecution of Defendant). The indictment alleged deceit during 2016–2017; whereas the pattern of intimidation began in 2012 (hours after the murder) and continued through 2019 (including at trial). Moreover, the burden of proof for a conviction for any indicted charge is proof beyond a reasonable doubt; whereas the burden of proof for a hearsay exception predicate is the preponderance of the evidence.[58]

As to other issues raised by the defense, evidence of deceit throughout the trial was not improper because the State's attempt to prove tampering by deceit did not become untenable until Wheeler was caught, arrested pursuant to the material witness warrant, and disavowed any deceit near the end of trial (October 28, 2019). So too, the defense has not shown why the material witness warrants, the false alibi affidavit purportedly by Watson, the use of various SBI numbers, or Defendant's

---

intimidation, involves a person who knowingly and with malice attempts to prevent…a witness to a crime…from making a report of a crime or from causing… [an] indictment to be…sought or prosecuted, or from assisting in the prosecution.

[58] *State v. Phillips*, 2014 WL 3400965 (Del. Super. Jul. 9, 2014) citing *Davis v. Washington*, 547 U.S. 813, 833 (2006).

importunate communications with his sister to procure false affidavits were improper.[59]

Accordingly, there was sufficient evidence to convict the Defendant without the statement of the absent witness. Furthermore, the statement of the absent witness was permissible as an exception to the hearsay rule, was not a deprivation of Defendant's confrontation rights, and its admissibility was determined by the preponderance of the evidence irrespective of the dismissal of the indicted charge of tampering by deceit. Defendant's Motion for a New Trial is **DENIED**.

**IT IS SO ORDERED**.

/s/Diane Clarke Streett
Diane Clarke Streett, Judge

Original to Prothonotary

cc:    Beth Savitz, Esquire, Deputy Attorney General
       Joseph S. Grubb, Esquire, Deputy Attorney General
       Anthony A. Figliola, Jr., Esquire

---

[59] Moreover, the defense did not ask for a hearing concerning the existence of false affidavits from others.